JAMES F. McKAY III, Judge.
 

 I,STATEMENT OF CASE
 

 On August 2, 2007, the State charged the defendant with one count of second-degree murder, a violation of La. R.S. 14:30.1 (Count 1); one count of armed robbery, a violation of La. R.S. 14:64 (Count 2); and one count of attempted second-degree murder, a violation of La. R.S. 14:30.1 and 14:27 (Count 3). The defendant was arraigned on August 16 and October 16, 2007, and pled not guilty on both occasions.
 

 On August 28, 2007, the defendant filed motions to suppress evidence, statement and identification. That same day, the court held a preliminary hearing.
 

 On October 23, 2008, the court denied the motion to suppress identification, and the defendant filed an oral motion to sever the counts. On January 30, 2009, the de
 
 *618
 
 fendant waived his outstanding motions to suppress.
 

 On April 28, 2009, the State filed an oral motion to sever the counts.
 

 On June 18, 2009, the jury found the defendant guilty of negligent homicide.
 

 On July 9, 2009, the State filed a multiple bill of information charging the defendant as a fourth felony offender, and the defendant filed a motion for post verdict judgment of acquittal, which the court denied on July 16, 2009. That day |2the court sentenced the defendant to five years on count 1, and the defense moved for reconsideration of his sentence, which the court denied. Following the multiple bill hearing, the court adjudicated the defendant a quadruple offender, vacated the defendant’s original sentence and re-sentenced him to seventy-five years at hard labor with credit for time served.
 

 On July 24, 2009, the State nolle prosed the remaining counts of the indictment.
 

 STATEMENT OF FACT
 

 NOPD Detective Regina Williams responded to a dispatch call on June 9, 2007, at 10:30 p.m. reporting the homicide of Albert Phillips, which occurred at the intersection of Spain and Marais Streets. By the time Detective Williams was able to relocate to the area, the initial scene investigation had been completed, so her supervisor directed her to the Fifth District Police Station to interview Arthur Price, a witness to the homicide. Based upon the statement given by Mr. Price, Detective Williams compiled a photographic lineup of suspects which included a picture of the defendant. Mr. Price identified the defendant’s picture as the killer and signed the back of the photograph. Based upon that identification, the detective obtained a warrant for the defendant’s arrest. During trial, Detective Williams identified the photo in the lineup from which Mr. Price identified the defendant. She placed the arrest warrant in the National Crime System Computer, and learned that the defendant was wanted for murder.
 

 The day after the crime, Detective Williams took taped statements from the defendant’s girlfriend, Tabitha Phillips, her son, Garland Phillips, and a third person, John Patio, at Ms. Phillips’ house on St. Claude Avenue. Next, the detective received permission to process the victim’s rental car for evidence ^because it was where the victim was shot. On June 11, 2007, Detective Williams received a call advising her that the defendant had walked into West Jefferson Hospital stating that he had been shot at the intersection of Spain and Marais Streets. She relocated to the hospital, read the defendant his rights, and arrested him for the first-degree murder of Albert Williams. The defendant agreed to waive his rights and gave Detective Williams a taped statement while in the hospital. The detective entered the tape statement into Central Property and Evidence and identified the transcribed copy of that statement at trial.
 

 In lieu of playing the tape for the jury in court because the defendant spoke of matters not pertinent to this case, the State and the defense agreed to have Detective Williams read to the jury, as it followed along from a copy, the redacted portions of the transcript of the defendant’s statement. In the portion of the statement read by Detective Williams, the defendant explained that he and the victim were friends. The defendant stated that he and the victim’s sister had been in a relationship some time before the victim’s death. The defendant said that on June 9, 2007, he was a passenger in the victim’s SUV. As the pair rode on Marais Street, the victim told the defendant that they were being followed by a burgundy BMW van. The van sped up beside the victim’s car
 
 *619
 
 and shot the victim in the side and chest and the defendant in the shoulder. The victim opened the car door and fell out. Although the victim kept a gun in his SUV, neither of them shot back at the assailants. The defendant was unable to place the victim back in the SUV, so the defendant drove the SUV to Tabitha’s house on St. Claude Avenue and told Garland Phillips to go see about the victim. Shortly thereafter, the defendant returned to the scene, where by that time people and the police had gathered. The defendant did not report to the police any facts of the shooting or that he had been |4shot. Instead, he returned to Tabitha’s house to find that police had arrived at that location. The defendant said that he decided to go to Walgreens to buy supplies to bandage his wounds, and he later sent friends to the hospital to check on the victim. He did not go to the hospital at that time. He added that he went to the hospital two days after the shooting to have his wounds tended, and he said that he had the detective’s number and was going to turn himself in because people were saying he had killed the victim, which he knew was not true.
 

 Detective Williams further testified that she was present when the crime scene technicians processed Phillips’ SUV and took blood samples, pictures and retrieved a bullet from the backseat of the SUV. Comparison of the bullet found in the backseat of the SUV to the bullet retrieved during the autopsy indicated that both bullets were fired by the same weapon. She also attended the autopsy and noted that one of the victim’s eyes had been shot out.
 

 On cross-examination, Detective Williams said that fingerprints, blood samples and glass fragments were recovered from the SUV. She acknowledged that certain items of clothing were taken from Tabitha Phillips’ house on St. Claude Avenue. Also, Detective Williams seized the victim’s cell phone and obtained cell phone records.
 

 On re-direct, Detective Williams indicated that she spoke to Robert Chestnut August 16, 2007, who told her he did not witness the homicide but heard the shooting. Chestnut was near the shooting scene on June 9 and after hearing gunshots, he saw the victim on the ground and saw a vehicle pull away from the scene in the direction of St. Claude Avenue. He could not say whether he saw a second vehicle. Detective Williams confirmed that Garland Phillips identified the defendant because the defendant was dating his mother at the time of the homicide.
 

 IsNOPD crime scene technician Betsy Johnson testified that she had worked in the crime lab for twelve years. Her duties include processing crime scenes — photographing the scene, dusting for fingerprints and otherwise collecting evidence. She did not process the scene of this crime but did inspect the victim’s black SUV at FBI storage and rendered a report of her findings on June 14, 2007. Technician Johnson photographed the SUV, lifted fingerprints from the SUV, and took pictures of the vehicle from various interior and exterior angles, which photos she identified and explained during trial. Johnson lifted eleven latent fingerprints from the SUV and deposited them in Central Evidence and Property (CEP) for testing.
 

 NOPD detective and expert fingerprint examiner, George Jackson, testified that he was able to obtain two test-worthy fingerprints from the eleven latent prints lifted from the victim’s black SUV. He ran one of the prints through the system, and the system produced a match as belonging to the defendant. Detective Jackson stated that Orleans Parish Criminal District Court requires ten points of identification of fingerprints to make a match. The
 
 *620
 
 fingerprint attributed to the defendant exhibited seventeen points of identification.
 

 Homicide Detective Eduardo Colmenero testified that he and Sergeant Caprera were dispatched to the scene of this shooting to assist in investigating the crime. In route to the scene they observed several vehicles at the intersection of Touro Street and St. Claude Avenue so they stopped there first. Lieutenant Rattler informed Detective Colmenero that the black SUV was found riddled with bullet holes at that location. Detective Colmenero also learned that the original shooting scene was at Spain and Marais. Detective Col-menero relocated to the shooting scene and found the dead victim face down with his arms tucked under his body. |G He documented the scene and located six .9 millimeter casings and eight .40 caliber spank casings there. Detective Regina Williams was actually in charge of the investigation; however, he arrived before Detective Williams because she was .investigating an unrelated matter. Detective Colmenero directed the crime scene technicians in taking photos and collecting evidence. During the trial, Detective Co-menero identified photos of the shooting scene including some showing the victim with a large amount of blood coming from his head. He also identified several photos of the victim’s SUV, which showed blood on the interior of the driver’s side as well as shattered glass caused by gunfire. On cross-examination, Detective Comenero testified that no firearms were recovered from either scene.
 

 Officer Shantel Bangham testified that she participated in the investigation of this case. She conducted a walk through of the scene and preserved the evidence where it was found until the crime lab technicians arrived. The victim’s body was still on the scene at the time she arrived. Officer Bangham explained that while she was on the scene she heard a cell phone ringing. She located the phone about a half a block away from the scene on Marais Street toward St. Roch Avenue. She answered the phone and was questioned by the caller about how she came into possession of the cell phone. She asked the caller to come to the scene and retrieve his phone, which he did. The person who came to get the phone identified himself as Arthur Price. Officer Bangham detained Price so that Detective Colmenero could speak to him. After she surrendered Price’s cell phone to Detective Comenero, she had nothing further to do with the case.
 

 The parties stipulated that, if called as a witness, NOPD Sergeant Gerard Winbush would testify, as a firearms examination expert, consistent with the lab |7report he produced in relation to his examinations of the shell casings found at the murder scene. The report was introduced into the record.
 

 The parties also stipulated that, if called as a witness, Dr. Richard Tracey would testify, as a forensic pathology expert, that he performed the autopsy on the victim at 9:30 a.m. on June 10, 2007, and that he determined the cause of death to be a gunshot between the eyes. Further, Dr. Tracey would also have testified that he retrieved the fatal bullet from the victim’s brain and placed it in a Coroner’s Office evidence envelope, and that he prepared an autopsy protocol, a copy of which was entered into the record.
 

 Arthur Price testified that he was presently incarcerated for attempted illegal possession of a firearm and assault on an officer with a gun. He further testified that the District Attorney had offered him a deal on other charges in exchange for testifying against the defendant, but Price refused the officer and was not testifying voluntarily. Price stated that he was
 
 *621
 
 drunk the night of the shooting and lost his cell phone. He said that he only remembered losing his cell phone because prosecutors showed him documentary evidence that it happened. He said he did not remember anything about that night, but did remember a female police officer talking to him that night. Price said he did not see anything on the night in question. Upon being shown a photographic line up from that night, Price identified his name and the date in his handwriting on the back of a picture.
 

 The State moved to have Price declared hostile and, after being advised of his rights by the judge, Price elected to speak with an attorney before testifying any further. After consulting with an attorney, Price invoked his Fifth Amendment privilege. Thereafter, the State sought to have him declared hostile. The State then sought to admit Price’s prior taped statement to the police, which the court granted | swith the admonition to the jury that his prior statement was to be considered only for impeachment purposes and not for its substantive truth. After the statement was played for the jury, the court declared Price hostile, and he continued to invoke his Fifth Amendment rights in response to the State’s questions.
 

 Price’s recorded statement indicated that on the night in question he came upon the defendant holding two men at gunpoint on Marais Street. As Price approached the location, he heard the defendant ask the men which one of them had spoken to his girlfriend. The defendant also included Price in the questioning. Both men and Price told the defendant they did not know what he was talking about and that none of them knew the defendant’s girlfriend. The defendant threatened to shoot the two men and Price if they did not answer his question. When the defendant placed his gun in his pants pocket, Price fled by jumping over a fence and hiding behind a building. As the other men fled, Price heard gunfire from two guns and theorized that one of the two men the defendant had threatened was armed. Price dropped his cell phone as he ran, so he returned to the area where he thought he had dropped it. When Price looked in the direction where the defendant was standing, he saw a flash from the defendant’s gun and heard the sound of breaking automobile glass. Price observed the defendant walk to a black SUV, which had been proceeding on Ma-rais Street, and pull the driver from the vehicle. As the defendant got into the SUV to leave the scene, Price noticed that the driver’s side window had been shot out. Price said that he did not know if the driver was dead. Price left the scene, and later that evening when he called his cell phone number, Detective Williams answered. Price explained that the cell phone belonged to him. The detective asked him to return to the scene to retrieve his 19phone. He did so, and at about 1:00 a.m. on June 10, 2007, he gave his taped statement to Detective Williams.
 

 Thirteen year old Garland Phillips testified that his uncle, Albert Phillips, was killed on the night of June 9, 2007. Garland knew the defendant from hanging out with his cousin John at Garland’s house on St. Claude Avenue. Garland saw the defendant drive up to his house at 10:80 p.m. in his uncle’s car the night his uncle was killed. When the defendant exited the vehicle, Garland noticed that he had blood on his shirt and jeans. Garland said that the defendant’s clothes were not stained with blood when Garland saw him earlier that day. Garland asked the defendant what had happened, and the defendant went to call Tabitha Phillips, but never entered the house. Instead, the defendant walked up the outside stairs to a closet space near the entrance to the apartment. When the defendant exited the closet, Gar
 
 *622
 
 land noticed that he had changed into a black tank top. The defendant left the house, and Garland and John followed him to the corner. When the defendant heard police sirens, he went in the other direction. Garland went home and called his mother to tell her that his uncle was dead. Garland said that when the defendant left his house, he did not observe the defendant in possession of a gun.
 

 The parties stipulated that, if called as a witness, a member of 'the NOPD Communications Department would authenticate the 911 tape associated with NOPD item number F-11055-07 as reflecting a call for service made at 10:11 p.m. on June 9, 2007, relating to the shooting of Albert Phillips at the intersection of Spain and Marais Streets. The tape was played for the jury.
 

 ERRORS PATENT
 

 A review for errors patent on the face of the record reveals none.
 

 ^ASSIGNMENT OF ERROR NUMBER 1
 

 In his first assignment, the defendant contends that the jury erred in finding the evidence sufficient to support his conviction of negligent homicide. The defendant argues that the jury improperly considered Arthur Price’s statement as substantive evidence, despite the district court’s instruction to the contrary.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Gilliam,
 
 36,118 (La.App.2 Cir.8/30/02), 827 So.2d 508.
 

 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983).
 

 |n Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Allen,
 
 36,180 (La.App.2 Cir. 9/18/02), 828 So.2d 622.
 

 La. R.S. 14:32 provides in pertinent part that:
 

 A. Negligent homicide is either of the following:
 

 (1) The killing of a human being by criminal negligence.
 

 (2) The killing of a human being by a dog or other animal when the owner is reckless and criminally negligent in confining or restraining the dog or other animal.
 

 
 *623
 
 B. The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.
 

 C. (1) Except as provided for in Paragraph
 

 (2) of this Subsection, whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than five thousand dollars, or both.
 

 La. R.S. 14:12 defines criminal negligence as follows:
 

 Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such a disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.
 

 To convict a person of negligent homicide, the State must prove beyond a reasonable doubt that the defendant was criminally negligent and that a killing resulted from this misconduct. La. R.S. 14:32;
 
 State v. Taylor,
 
 585 So.2d 655 (La.App. 4 Cir.1991).
 

 The offense of negligent homicide is not an intentional crime, and intent is not an element of negligent homicide.
 
 State v. Guillot,
 
 277 So.2d 146 (La.1973).
 

 1 ^Jurisprudence shows that the common element in negligent homicide cases involving firearms is a finding that a defendant acted in an unreasonably dangerous or unsafe manner at the time of the discharge of his weapon. Evidence of negligent homicide was found to be sufficient in
 
 State v. McFerson,
 
 583 So.2d 516 (La.App. 3 Cir. 8/6/91), where it was determined that the defendant acted below the standard of care expected to be maintained by reasonably careful persons under similar circumstances when he brought a loaded gun into a bar, pulled the gun out of his pants pocket, and the gun discharged killing an innocent victim.
 

 Pointing a loaded gun in the direction of another, who ultimately suffers a fatal wound as a result of the gun’s discharge, amounts to criminal negligence sufficient to establish a “classic case of negligent homicide.”
 
 State v. Barberousse,
 
 480 So.2d 273, 276 (La.1985).
 

 When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under
 
 Jackson v. Virginia, supra. State v. Davis,
 
 92-1623 (La.5/23/94), 637 So.2d 1012.
 

 The circumstantial evidence in this case included the defendant’s statement in which he placed himself on the scene at the time of the shooting, acknowledged that he knew the victim, and admitted that he witnessed the shooting and had access to a gun. Also, Detective Williams testified that when she presented Arthur 11sPrice with the photo lineup, he immediately identified the defendant’s picture and placed his signature on the back of the photo. Moreover, although the jury was instructed to consider the statement Price gave to Detective Williams the night of shooting for impeachment purposes only and not as substantive evidence of the defendant’s guilt, the jury witnessed Price identify his signature on the back of the defendant’s photograph, thus corrobo
 
 *624
 
 rating his identification of the defendant as the shooter. Further, Officer Bing-ham’s testimony that Price’s cell phone was found at the shooting scene further corroborated Price’s presence at the scene so as to have witnessed the crime. In addition, the jury heard the defendant’s statement to Detective Williams placing himself at the scene with access to a gun in the victim’s SUV. Furthermore, latent fingerprints lifted from the front and rear passenger side doors of the victim’s SUV confirmed the defendant’s presence in the vicinity of the SUV.
 

 Other circumstantial evidence of the defendant’s guilt included the defendant’s statement that he avoided the police at both the scene and at Touro Hospital. Despite the defendant’s claim that he and the victim were good friends, the defendant did not return to the scene to check on the victim; instead the defendant asked other people to do so. Just as telling, the defendant did not tell police that he had been shot in an unprovoked ambush nor did he seek medical attention for his wounds for more than twenty-four hours after the shooting. Finally, the jury heard Garland Phillips testify that when the defendant arrived at 2001 St. Claude Avenue in the victim’s truck after the shooting, the defendant’s shirt had blood on it, prompting the defendant to change his shirt. Garland Phillips also stated that the defendant suspiciously avoided oncoming police vehicles when the defendant left the St. Claude Avenue residence. Consequently, it was not 114unreasonable for the jury to conclude from the evidence and the defendant’s strange behavior that he had a guilty conscience over the victim’s death and sought to avoid responsibility for the shooting.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for the factual conclusion notwithstanding that other witnesses testify to the contrary, and an appellate court is not in a position in such a case to say that the trier of fact erred in believing the one witness rather than the several.
 
 State v. Garlepied,
 
 454 So.2d 1147 (La.App. 4 Cir.1984). In this case, the jury chose to credit the testimony of the State’s witnesses over the defendant’s exculpatory statement to the police. The jury’s verdict was not based on Price’s statement. This assignment is without merit.
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 In his final assignment of error, the defendant argues that his seventy-five year sentence as a fourth felony offender is an unconstitutionally excessive sentence. He also maintains that even a twenty year sentence—the minimum under the habitual offender law—would be unconstitutionally excessive when applied to the crime of negligent homicide.
 

 When a defendant fails to set forth specific grounds upon which his motion to reconsider is based, as occurred in this case, the defendant is entitled only to bare review of the sentence for constitutional excessiveness. U.S.C.A. Const.Amend. 8; La.C.Cr.P. art. 881.1, subds. B, E.
 

 Article I, § 20 of the Louisiana Constitution of 1974 provides that “[n]o law shall subject any person ... to cruel, excessive or unusual punishment.” A sentence, although within the statutory limits, is constitutionally excessive if it is | TS“grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless and needless imposition of pain and suffering.”
 
 State v. Caston,
 
 477 So.2d 868, 871 (La.App. 4 Cir.1985). However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.
 
 State
 
 
 *625
 

 v. Brady,
 
 97-1095 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264.
 

 Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case.
 
 State v. Black,
 
 98-0457, p. 8 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 892. Articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions and, accordingly, the trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. See
 
 State v. Landos,
 
 419 So.2d 475, 478 (La.1982) (where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1);
 
 State v. Davis,
 
 448 So.2d 645, 653 (La.1984) (the trial court need not recite the entire checklist of article 894.1, but the record must reflect that it adequately considered the guidelines). If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case.
 
 State v. Caston,
 
 477 So.2d at 871. The reviewing court must also keep in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.
 
 State v. Quebedeaux,
 
 424 So.2d 1009, 1014 (La.1982).
 

 11frLa.C.Cr.P. art. 894.1 provides guidelines for sentencing. According to this article, the court must state for the record “the considerations taken into account and the factual basis therefor in imposing sentence.” However, even if the trial court fails to articulate considerations, a reviewing court needs simply to be able to discern the reasons of the trial judge, and the record itself may provide these reasons.
 
 State v. Green,
 
 409 So.2d 563 (La.1982);
 
 State v. Day,
 
 391 So.2d 1147 (La.1980).
 

 The trial court has great discretion in sentencing within the statutory limits.
 
 State v. Trahan,
 
 425 So.2d 1222 (La.1983). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
 

 It is well established that, “[t]he sources of information from which a sentencing court may draw are extensive, and traditional rules of evidence are not bars to consideration otherwise relevant information.”
 
 State v. Moss,
 
 2008-1079, p. 27 (La.App. 4 Cir. 7/22/09), 17 So.3d 441, 457,
 
 writ den.
 
 2009-1895 (La.4/9/10), 31 So.3d 382, citing
 
 State v. Washington,
 
 414 So.2d 313 (La.1982). Evidence of other crimes which have not been adjudicated is relevant and probative evidence of the defendant’s character and propensities.
 
 Id.
 
 Sources of information relied on by the sentencing court may include hearsay and arrests, as well as conviction records.
 
 State v. Myles,
 
 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses.
 
 State v. Sepulvado,
 
 44,764 (La.App. 2 Cir. 10/28/09), 25 So.3d 899,
 
 writ den.
 
 2009-2590 (La.5/28/10), 36 So.3d 245.
 

 The defendant in this case was charged with the second degree murder of the victim; however, the jury returned the verdict of guilty to the responsive offense of 117negligent homicide. The defendant was sentenced under Louisiana’s Habitual Offender Law as a fourth felony offender. As such, the sentencing exposure ranges from a term of not less than the longest
 
 *626
 
 period prescribed for a first conviction, but in no event less than twenty years and not more than natural life. La. R.S. 15:529.1 A(c)(i). Since the habitual offender law in its entirety is constitutional, the minimum sentences it imposes upon multiple offenders are also presumed to be constitutional.
 
 State v. Johnson,
 
 97-1906 (La.03/04/98), 709 So.2d 672, 675. Although the trial judge in this case did not articulate the factual basis for the sentence, in light of the facts of this case, the imposition of the maximum sentence was not excessive, nor does the trial judge’s failure to enumerate the factors listed in La.C.Cr.P. 894.1 require remand. See
 
 State v. Martin,
 
 400 So.2d 1063 (La.1981) on rehearing;
 
 State v. Hawthorne,
 
 454 So.2d 285 (La.App. 4 Cir.1984);
 
 State v. Collins,
 
 461 So.2d 384 (La.App. 4 Cir.1984).
 

 The trial judge in this case imposed a seventy-five year sentence based upon the defendant’s prior convictions, which include first-degree robbery (which was reduced from an initial charge of armed robbery — a crime of violence) as well as possession of cocaine with intent to distribute and simple possession of cocaine. The defendant’s felony conviction history stretches back to at least 1992 — some fifteen years prior to the victim’s death— and includes a previous victim crime. Moreover, the defendant’s actions following the shooting demonstrated that he had less concern for his dying friend than for concealing the evidence of his own involvement in that friend’s death.
 

 Although a search of the jurisprudence did not produce any cases of comparable sentences for a quadruple offender convicted of negligent homicide, the facts indicate that the defendant acted with such disregard of the interest of 11sothers that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances, and that, due to his criminal disregard, the victim was shot in the head and died. The trial court had ample reason to impose the sentence it did in light of the defendant’s extensive and violent criminal history.
 

 Finally, the defendant has failed to show how his sentence constitutes nothing more than the purposeless imposition of pain and suffering. In short, he has failed to show that his seventy-five year sentence as a fourth felony offender is constitutionally excessive.
 

 CONCLUSION
 

 After a careful review of the record before this Court, and the applicable jurisprudence, we affirm the defendant’s conviction and sentence.
 

 AFFIRMED.