Judge TERRI F. LOVE.
|! Felton Bernard (“Defendant”) appeals his conviction and sentence for four counts of first degree murder in violation of La. R.S. 14:30. The Defendant assigns as errors that (1) the evidence is insufficient to prove he murdered Lionell and Leon Mis-kell; (2) the State failed to establish the scientific basis for the firearms evidence presented at trial, and consequently, the evidence is insufficient to connect him to the murders of Diane Miskell and John Robinson; (3) the non-unanimous jury verdicts are unconstitutional; and (4) the sentences are excessive. We find the corroboration of witness testimony and evidence presented at trial sufficiently proved the *1068 Defendant killed Lionell and León Miskell. The State properly established, through expert testimony, the scientific basis for the firearms evidence admitted at trial, on which the jury could sufficiently rely to connect the Defendant to the murders of Diane Miskell and John Robinson. Additionally, Louisiana jurisprudence demonstrates that the Sixth Amendment does not require unanimous jury verdicts in state criminal trials. Nor does our jurisprudence suggest that the trial court ordering the Defendant to serve his sentences consecutively is ^unconstitutionally excessive. Therefore, we affirm the Defendant’s convictions and sentences.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The events that transpired on November 4, 2006 in this case evolved from a dispute over the ownership of property located at 4635 Camelia Street in East New Orleans. Margie Miskell owned the Camelia Street house until her death in 2004. She was survived by her five living children, Lio-nell, Leon, Diane, Shirley, and Irma Mis-kell. Margie Miskell was also survived by several grandchildren including: Diane Miskell’s two sons — and Tim; Shirley Mis-kell’s daughter — Tonya; and Irma Mis-kell’s seven children — Angela, Chantel, Eric, Bryan, Herman, Tony, and Felton Bernard.
At trial, testimony established that in 2006, Diane and Shirley Miskell were responsible for overseeing the repairs to the Camelia Street property after Hurricane Katrina. According to Kevin Miskell and Tony Bernard, once the repairs were complete, Lionell and Leon Miskell were going to move into the Camelia Street residence. Kevin Miskell also testified that the Defendant had disagreements with the family because he believed his grandmother passed her ownership rights to him when she died. Likewise, the Defendant believed he should be in charge of the finances used to repair the Camelia Street property and not his aunts.
The Defendant’s oldest brother, Herman James Bernard, Jr. (“Herman Bernard”), testified at trial and recalled seeing the Defendant with the Defendant’s friend, Corey Berniard, on November 4, 2006, in a green Jeep. Herman Bernard' testified that his brother the Defendant had just arrived in New Orleans from Houston, Texas. Herman stated that the Defendant and Corey Berniard came by | Shis trailer on Viola Street and spoke with him. He testified that he noticed that Corey Bern-iard was armed and told him to leave. At that point, Corey Berniard and the Defendant left.
On the same day, the Defendant’s other brother Tony Bernard was visiting his uncles Lionell and Leon Miskell at the Came-lia Street residence when the Defendant and his friend Corey Berniard arrived. Tony Bernard testified that the Defendant and Corey Berniard were both armed. According to Tony Bernard, the Defendant walked into the house, slapped Lionell Miskell and then started an argument about ownership of the Camelia Street property. Tony Bernard attempted to diffuse the situation by giving the Defendant money. Afterwards, the Defendant and Corey Berniard left in an SUV, but turned around and came back to the residence.
Tony Bernard testified that he witnessed his brother the Defendant and Corey Berniard shoot Lionell Miskell. Tony Bernard fled the scene as the Defendant stood over Leon Miskell and shot him. At trial, Tony Bernard stated that he called his brother Bryan and his aunt Diane Mis-kell, but he received no answer. He then contacted his sister Angela Bernard about the shootings. Tony Bernard testified that he told his sister to send “someone to go check” because he was too scared to go back himself. Tony Bernard also stated *1069 that a few days after the shootings he spoke to a NOPD detective, who presented him two photographic lineups from which Tony Bernard identified the Defendant and Corey Berniard as the men he witnessed shoot his uncles.
Responding officers, Reginald Gaines (“Officer Gaines”) and Toka Clark (“Officer Clark”), arrived at the 4600 block of Camelia Street close to ten o’clock at night, after receiving a call of a shooting. The officers noted the area was Rdeserted and dark, the remnants of Hurricane Katrina. However, they observed the body of Lionell Miskell in the street at the curbside. Upon closer observation, the officers noted several gunshot wounds to the victim’s body. An EMS unit was then dispatched to the scene. By that time, other police units arrived and Officer Gaines remained with Lionell Miskell’s body in the street while the other officers secured the perimeter.[1]
At that time, the officers received word that there was a second victim located in the back yard of 4635 Camelia Street, across the street from where they observed Lionell Miskell’s body. The officers relocated to the backyard of the Camelia Street property where they found Leon Miskell. Officer Clark testified that Leon Miskell was conscious and moaning in pain.
Officer Shonndell Fields (“Officer Fields”) also testified at trial that when she arrived at the scene, she observed the body of a man lying in the street. She stated that after securing the perimeter she, Officer Clark, and the other responding officers were notified of another male victim in the backyard of the house across the street from where the first victim was found. She and the other officers proceeded to the backyard where they found a black male, who had been shot, lying face down on the ground. She testified that the man was conscious and after turning the victim over, Officer Fields recognized him as Leon Miskell. She stated that she recognized him from patrolling the area and from having arrested him earlier on a burglary charge. When she asked Leon Miskell who shot him, he | Rresponded: “My nephew, Felton Bernard.”[2] At trial, Officer Fields stated that she had no knowledge of the Miskell family and did not know the Defendant.
Ann Bernard, the Defendant’s aunt[3], testified that she received a telephone call on the night of the shootings from her niece Angela Bernard, who was living in Alabama. Because she lived close by, she was asked to check on Angela’s aunt Diane Miskell. Ann Bernard testified that she went to Diane Miskell’s FEMA trailer located at 4567 Dodt Street. When Ann Bernard arrived at the residence, she found the trailer door open and noted that she found that to be odd. She blew her car horn, but she received no response. Ann Bernard left the Dodt Street address and drove to the Camelia Street residence, where she found police officers on the scene. She described what she observed at the Dodt Street address to the officers including Officer Clark, who accompanied *1070 her to the location. At trial, Officer Clark testified that upon arriving at the Dodt Street location, she entered a FEMA trailer and found Diane Miskell and John Robinson shot to death.
Detective Greg Hamilton (“Detective Hamilton”) testified at trial that he was assigned to the homicide unit on the date of the incident. When he arrived at the Camelia Street crime scene, he spoke with the responding officers, including Officer Clark, who related the circumstances of finding Leon Miskell. From his conversation with Officer Fields, he developed the Defendant as a suspect in the shooting. Detective Hamilton also directed the collection of evidence from the Camelia Street scene. The evidence consisted of three spent 9 millimeter casings | fiand one bullet; one spent 10 millimeter casing; as well as clothing and blood samples.
Detective Hamilton also learned of a possible second incident at the Dodt Street address from Ann Bernard, who arrived at the Camelia Street residence during his investigation of the crime scene. He testified that he sent units to investigate and later learned that two bodies were found in a trailer on Dodt Street. He relocated to the Dodt Street residence, observed the scene, and evidence was collected. The evidence included one spent 9 millimeter casing and one spent bullet in addition to photographs that were taken at the trailer. From his investigation of the Camelia Street crime scene, Detective Hamilton learned that the Dodt Street incident was related to the shootings of Lionell and Leon Miskell.
That same evening, Ann Bernard gave Detective Hamilton a recorded statement. Likewise, Detective Hamilton received recorded statements from the Defendant’s brothers Bryan, Herman, and Tony Bernard. Detective Hamilton also received statements from the . Defendant’s fiance, Emerald Lee, who lived in Katy, Texas, as well as Carl Breaux[4]. At trial, Detective Hamilton described the photographic lineup procedure conducted with the Defendant’s brother Tony Bernard, who witnessed the shootings of Lionell and Leon Miskell. Detective Hamilton testified that based on Tony Bernard’s positive identification of the Defendant and his friend Corey Berniard, he obtained arrest warrants for both individuals.
Sergeant Breck McDaniel (“Sergeant McDaniel”) of the Houston Police Department testified that in 2006 he learned from the NOPD that the Defendant |7and Corey Berniard were wanted in connection with homicides in New Orleans. Sergeant McDaniel spoke to the Defendant’s fiance, Emerald Lee, who provided a Houston telephone number for the suspects, and from which he located the suspects’ apartment. Both individuals were arrested in Houston on November 13, 2006 and subsequently extradited to Louisiana.
At trial, Dr. Richard Tracy (“Dr.Tracy”), an expert in the field of forensic pathology, testified that he performed the autopsies of Lionell, Leon, Diane Miskell, and John Robinson. Dr. Tracy stated that all victims died of gunshot wounds, and all deaths were classified as homicides.
Dr. Tracy testified that Leon Miskell was hospitalized for twenty-seven days pri- or to his death. He noted the bullet tracks on Leon Miskell’s body, including four entry wounds on the left side of the torso, three of which entered his abdomen. Dr. Tracy indicated that the hospital declared that Leon Miskell died from bronchopneu-monia. On cross-examination, Dr. Tracy testified that Leon Miskell would not have *1071 survived despite his development of pneumonia because he also suffered from peritonitis and septicemia caused by the gunshot wounds.
As to Lionell Miskell, Dr. Tracy testified that he suffered three fatal gunshots to the chest and torso. Toxicology tests were negative for alcohol and street drugs. Likewise, Dr. Tracy’s findings from Diane Miskell’s autopsy revealed that she suffered two gunshot wounds — one superficial wound to the left shoulder and a fatal shot to her head through her right ear, causing her to bleed to death. The autopsy of John Robinson proved that he died of a gunshot through the heart. Dr. Tracy also indicated that bullets were recovered from all of the victims’ bodies.
Additionally, Officer Kenneth Leary (“Officer Leary”), a NOPD firearms examiner with thirty years’ experience, testified that part of his job requires him to Isdetermine whether a particular bullet or cartridge was fired from a certain handgun, rifle or shotgun to the exclusion of all other weapons. To make his determination, he analyzes microscopic examination of markings, which are transferred from a weapon to the surface of the ammunition fired by that weapon. The markings are unique to the weapon that fired them and cannot be duplicated by any other weapon.
In this case, Officer Leary’s investigation led him to test cartridge cases, bullets, bullet jackets, and lead cores in relation to the two homicide scenes. Officer Leary explained to the jury that he compared the three fired 9 millimeter cartridge cases, two fired bullets collected from Lionell Miskell’s autopsy and two 9 millimeter cartridges collected from the Camelia Street residence using a comparison microscope. From his review, he determined that the bullets entered into evidence were fired from the same weapon.
Officer Leary also examined ballistics from the Dodt Street crime scene, including one spent 9 millimeter casing, one fired 9 millimeter bullet, and one 9 millimeter aluminum bullet jacket collected from the autopsy of Diane Miskell, and a spent 9 millimeter casing found in Diane Miskell’s body bag. He determined that the ballistic evidence taken from the Dodt Street crime scene and the autopsies of Diane Miskell and John Robinson indicated that the bullets were fired from the 9 millimeter gun used at the Camelia Street shootings.[5]
In March" 2007, the Defendant, Felton Bernard, and Corey Berniard were indicted on four counts of first degree murder for the November 2006 shooting deaths of Leon, Lionell, Diane Miskell, and John Robinson. The trial court later |3severed the trials as to the co-defendants. Subsequently, the trial court denied the Defendant’s motion to suppress identification and ruled Leon Miskell’s statements to police shortly after he was shot admissible at trial.[6] After the State declared it would not seek the death penalty, the Defendant’s case proceeded to trial in October 2013. The jury returned a verdict of guilty as charged on all counts.
The Defendant was sentenced to life imprisonment in November 2013 on all counts. The sentences on counts 1 and 2 were ordered to be served concurrently with each other. Likewise, counts 3 and 4 were ordered to be served concurrently *1072 with each other. The trial court further ordered that the sentences on counts 3 and 4 were to run consecutive to counts 1 and 2 because there were “two separate crime scenes.” The instant appeal follows.[7]

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

SUFFICIENCY OF THE EVIDENCE

In his first and second assignments, the Defendant argues that the evidence is insufficient to support his convictions for four counts of first degree murder. The Defendant first argues that the evidence is insufficient to prove that he murdered Lio-nell and Leon Miskell (counts 1 and 2). The defendant claims that the trial court erred in ruling that Leon Miskell’s statement that the Defendant shot him was a “dying declaration.” Instead, the Defendant asserts that'the statement |inwas inadmissible hearsay, and further, was insufficient to prove the defendant’s identity as the man who shot Leon Miskell.
The Defendant also claims that the State failed to prove that he murdered Diane Miskell and her friend John Robinson (counts 3 and 4) because the scientific basis for the firearms evidence was not established and was insufficient to connect him to those offenses.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992)).
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988). If rational triers of fact could disagree as to the interpretation of the evidence, the fact finder’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id. at 1309. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
Lfin addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the *1073 Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
In State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996, this Court stated:
Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938 (La.1984).
The testimony of a single witness, if believed by the trier of fact,- is sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
A review of the record for sufficiency of the evidence “encompasses all of the evidence introduced at trial, inadmissible as well as admissible.” State v. 12Bolden, 11-2435, p. 2 (La.10/26/12), 108 So.3d 1159, 1161. Additionally, when a key issue is the defendant’s identity as the perpetrator, the State is required to negate any reasonable probability of misiden-tifieation. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311.
Testimonial Evidence
The Defendant was convicted of the first degree murders of four people. La. R.S. 14:30(A)(3) defines first degree murder, in relevant part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1); State v. Harris, 02-2434, p. 4 (La.App. 4 Cir. 5/28/03), 859 So.2d 690, 693.
Specific intent may be inferred from the circumstances and actions of the defendant, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373-74. A defendant’s act of aiming a lethal weapon and discharging it in the direction of his victims supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Hoffman, 98-3118, p. 48 (La.4/11/00), 768 So.2d 542, 585.
A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present, or absent, are equally culpable. La. R.S. 14:24; State v. Schwander, 345 So.2d 1173, 1174 (La.1977).
| iSThe evidence in this case shows that (1) the Defendant had a disagreement with his aunt Diane Miskell and other family members over money and ownership of property; (2) the Defendant and his friend, Corey Berniard, were in the city at the time of the deaths; (3) both the Defendant and Corey Berniard were armed on the day of the shootings; (4) the Defendant and Corey Berniard arrived at the Camelia Street residence together; (5) Tony Bernard witnessed the Defendant and Corey Berniard shoot Leon and Lio-nell Miskell several times after an argument over the Camelia Street property; (6) Leon Miskell told the police that the *1074 Defendant had shot him; and (7) the Defendant and Corey Berniard fled the jurisdiction to Houston.
Additionally, the evidence herein shows that the two shooting scenes were within two blocks of each other, and that Diane Miskell and John Robinson were shot within minutes of Leon and Lionell Mis-kell. The money dispute and the ownership issue of the Camelia Street property that the Defendant had with Leon and Lionell Miskell were the same disagreements the Defendant had with Diane Mis-kell. The ballistic evidence presented at trial indicated that the same 9 millimeter weapon was used to shoot all four victims.
Viewing the evidence in this case in the light most favorable to the State, it was not unreasonable for the jury to conclude that after killing his uncles at the Camelia Street residence, the Defendant went to his aunt’s residence a couple of blocks away and shot her and her friend, John Robinson. The evidence proves that the defendant shot the four victims with the intent to kill or to inflict great bodily harm on them. At the very least, the jury was not remiss in finding the defendant a principal to the first degree murders of Diane Miskell and John Robinson.
114Scientific Basis for Firearm Evidence
As to the Defendant’s claim that the evidence was insufficient to convict him of the first degree murders of Diane Miskell and John Robinson because the scientific basis for the firearms evidence was not established, the Louisiana Supreme Court previously addressed the standards considered to determine whether such evidence is admissible. In State v. Foret, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Daubert test established the proper standards for the admissibility of expert testimony, which “requires the trial court to act in a ‘gatekeeping’ function ‘to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.’ ” State v. Chauvin, 02-1188, p. 5 (La.5/20/03), 846 So.2d 697, 700-01 (citing Daubert, 509 U.S. at 589, 113 S.Ct. at 2795).
To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and admissible at trial, the Supreme Court expounded on the factors to consider: “1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community.” Id., 02-1188, p. 5, 846 So.2d at 701 (citing Daubert, 509 U.S. at 592-94, 113 S.Ct. at 2796-97). In Foret, the court adopted these factors as a guide for lower courts in resolving the issue. Foret, 628 So.2d at 1123. Thus, in order for technical or scientific expert testimony to be admissible under La. C.E. Art. 702, the scientific evidence must rise to a threshold level of reliability. Id. The trial court may consider one or more of the four Daubert | ^factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Daubert, 509 U.S. at 592-94, 113 S.Ct. at 2796-97. Rather, the law grants a trial court the same broad latitude in determining the reliability of scientific testimony as it does with its ultimate reliability determinations. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). A trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702; *1075 State v. Gipson, 37,132, p. 16 (La.App. 2 Cir. 6/25/03), 850 So.2d 973, 982.
Generally, the test for determining an expert’s competency is the expert’s knowledge of the subject about which he is called upon to express an opinion. State v. Ferguson, 09-1422, p. 25 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 166. “A combination of specialized training, work experience and practical application of the expert’s knowledge can combine to establish that person as an expert.” Id. (quoting Gipson, 37,132, p. 16, 850 So.2d at 982). Courts can also consider whether a witness has previously been qualified as an expert. State v. Craig, 95-2499, p. 9 (La.5/20/97), 699 So.2d 865, 870.
Officer Leary testified regarding his education and experience. Officer Leary has been qualified and testified as a ballistic expert in state and federal courts in Louisiana on numerous occasions. He testified that he regularly attended proficiency classes and advanced firearms training. For the thirty years he was involved in firearms examination, Officer Leary’s testing methods have been consistent and included test-firing bullets from suspected crime weapons and comparing those spent bullets to bullets obtained from a crime scene and/or victims’ autopsies.
11 (¡Officer Leary then compares the exhibits to one another on a comparison microscope and performs side-by-side comparisons of the class and individualizing characteristics to reach his conclusion. Further, Officer Leary explained that he followed the aforementioned testing methods in this case and discovered that the bullets recovered during the autopsies of the four victims were fired from the same 9 millimeter weapon. Officer Leary testified that he was able to match fired bullet casings “through microscopic examination of different markings that are transferred from the surface of the weapon to the surface of the ammunition component with which contact is made. All of the markings are uniquely produced by the one weapon that fired them and cannot be duplicated by any other weapon.”
Defense counsel questioned Officer Leary’s non-membership in several national groups devoted to the testing and identification of ballistics evidence. However, Officer Leary explained that in order to work as a firearms examiner, he is not required to belong to any of those groups. Defense counsel also questioned Officer Leary’s testing methodology and the margin of error associated with it; however, the defense did not produce any documentation calling the methodology into question. Accordingly, we find the trial court did not abuse its discretion when it determined that Officer Leary’s testing was based upon reliable scientific methodology.
Dying Declaration
The Defendant also claims that Leon Miskell’s alleged dying declaration was inadmissible hearsay and insufficient to prove his identity as the shooter. La. C.E. art. 801(C) defines hearsay as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” See State v. Broadway, 96-2659 117(La.10/19/99), 753 So.2d 801. Hearsay is ordinarily not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. Moreover, a trial court’s ruling on the admissibility of evidence will not be disturbed in the absence of a clear abuse of the trial court’s discretion. State v. Bell, 05-0808, p. 12 (La.App. 4 Cir. 12/6/06), 947 So.2d 774, 781 (quoting State v. Hall, 021098, p. 8 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 496). A trial court is vested with much discretion in determining whether the probative value of relevant *1076 evidence is substantially outweighed by its prejudicial effect. Hall, 02-1098, p. 8, 843 So.2d at 496.
Exceptions to the hearsay rule include dying declarations. La. C.E. art. 804(B)(2). A dying declaration is defined as “[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” A statement is admissible as a dying declaration if it is made when the declarant is conscious of his condition and aware of his approaching demise. State v. Ramirez, 09-350, p. 16 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 845, citing State v. Verrett, 419 So.2d 455, 457 (La.1982). “The victim need not express his awareness of his demise in direct terms, but rather the necessary state of mind may be inferred from the facts and circumstances surrounding the making of the declaration.” Id., 09-350, p. 17, 30 So.3d at 845.
The Defendant in this case argues that there was no indication that Leon Miskell believed his death was imminent at the time he made the statement that his nephew shot him. Moreover, the Defendant points out that Leon Miskell lived for over twenty days before dying of pneumonia.
|18This Court in State v. Henderson, 95-0267 (La. 4 Cir. 4/3/96), 672 So.2d 1085, discussed the determination of whether or not the declarant believed at the time of making a statement that he was dying. This Court stated:
[N]o absolute rule can be laid down by which to decide with certainty whether the declarant, at the time of making his statement, really expected to die, yet when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making his statement died, the courts have uniformly held that the declarant really believed that death was impending, and his statement has been admitted as a dying declaration.
Id., 95-0267, p. 6, 672 So.2d at 1089 (quoting State v. Augustus, 129 La. 617, 619, 56 So. 551, 552 (1911)).
In State v. Nicholson, 96-2110, p. 6 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, 177, this Court noted that a statement, even if it is made in response to a question, may be admitted as a dying declaration if it was made when the declarant was conscious of his condition and aware of his approaching demise. Also, the more serious the injury and the greater the victim is impaired, the more probable it is that the victim believed that he was dying. Id. The fact that Leon Miskell survived over twenty days after the shooting does not automatically render the statement inadmissible as a dying declaration. In Nicholson, 96-2110, p. 6-8, 703 So.2d at 176-77, this Court upheld the introduction of the victim’s statements made to his mother and an investigating officer during his hospital stay as dying declarations even though the victim lingered for sixteen days before dying. See also State v. Matthews, 95-1245 (La.App. 4 Cir. 8/21/96), 679 So.2d 977 (finding victim’s statements qualified as dying declarations, even though the victim did not tell anyone he knew he was going to die; also noting the victim’s grave condition and that he told his mother he loved her just before lapsing into unconsciousness on the way to the hospital); State v. Foote, 379 So.2d 1058 (La.1980) (holding the |19victim’s statements at the scene to a neighbor and at the hospital to a deputy were admissible as dying declarations, where he died eleven days later from six gunshot wounds; also considering that the victim remained comatose for much of the time before his death).
In State v. Winn, 97-2509, p. 6-7 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271, 1274, this Court stated that “[i]n determining *1077 whether the declarant believed that her death was imminent, courts have looked not only to any actual words of the declar-ant as to this belief, but also to the circumstances surrounding the statement, to determine if the declarant actually believed her demise was imminent.” Thus, the de-clarant’s belief that he was dying can be determined not only by the declarant’s statement that he believes death is impending, but also by an assessment of the circumstances under which the declaration was made.
In this case, the officers testified that upon arriving within minutes of the shootings, it was readily apparent Leon Miskell was in severe pain as a result of the gunshots wounds. Although he was lucid at the time the officers found him and complained of the pain, he passed in and out of consciousness. He was weak, but he was persistent in making the officers aware that the Defendant shot him. Leon Miskell sustained four 9 millimeter bullet wounds to his torso, which would be sufficient cause for anyone to believe that the injuries were fatal.
Officers Clark and Fields testified that they knew Leon Miskell was seriously wounded as they noted the significant amount of blood loss when they found him in the back yard. They also testified that they both heard Leon Miskell identify his nephew, the Defendant, as the man who shot him. Tony Bernard, the Defendant’s brother, testified that he saw the Defendant shoot Leon and Lionell |¡,nMiskell. Furthermore, all witnesses were subjected to rigorous cross-examination by the defense.
Additionally, Leon Miskell’s statement was also admissible pursuant to the “excited utterance” exception of the hearsay rule. An excited utterance is defined as “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” La. C.E. art. 803(2). For the excited utterance exception to the hearsay rule to apply, the event must be sufficiently startling to render a declarant’s normal reflective thought process inoperative, and the statement must be a spontaneous reaction to the event and not the result of reflective thought. State v. Henderson, 362 So.2d 1358, 1362 (La.1978); State v. Hester, 99-426, p. 14 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 106.
The most important factor in determining whether a statement was made under the stress of a startling event is time. Courts have also considered whether the statement is self-serving or in response to an inquiry; whether'the statement expands beyond a description of events to include past or future facts; and whether the declarant performed tasks requiring reflective thought between the event and the statement. Id., p. 14-15, 746 So.2d at 106. The trial court must determine “whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process.” State v. Dalton, 99-0902, p. 4 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 183.
In State v. Moye, 99-2413, p. 6-7 (La.App. 4 Cir. 6/14/00), 765 So.2d 1103, 1107, this Court found the victim’s identification of the defendant as the shooter when the police entered the house and found him lying on the floor bleeding from |aihis wound was admissible under the excited utterance exception to the hearsay rule. This Court noted that the victim “was still under the stress of excitement caused by his being shot when he identified the defendant as the one who shot him.” Id., 99-2413, p. 7, 765 So.2d at 1107.
In light of our jurisprudence and the evidence presented at trial, we find no *1078 error by the trial court in admitting the statements under either the dying declaration exception or the excited utterance exception.
Nevertheless, even if the complained of testimony was improperly allowed as an exception to the hearsay rule, our Supreme Court has long held that the admission of hearsay testimony is harmless error where the effect is merely cumulative of other testimony adduced at trial. State v. Johnson, 389 So.2d 1302, 1306 (La.1980).
A review of the record indicates that the verdict in this case was not attributable to the asserted error that the trial court allowed the introduction of inadmis- • sible evidence. Therefore, whether or not the Defendant’s claim had merit, the error was harmless. Even excluding Leon Mis-kell’s out-of-court identification, the Defendant was identified by his brother Tony Bernard. The effect of Leon Miskell’s out-of-court identification was merely cumulative as well as corroborative of other testimony adduced at trial. Therefore, we find the Defendant’s assignments of error as to the sufficiency of evidence are without merit.

CONSTITUTIONALITY OF NON-UNANIMOUS JURY VERDICTS

In a third assignment of error, the Defendant argues that the jury verdicts in this case should be declared invalid because non-unanimous verdicts violate the Sixth and Fourteenth Amendments of the United States Constitution.
_JjgLouisiana Constitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La. C.Cr.P. art. 782(A) provides that “[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
Defendant argues that the United States Supreme' Court decision in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), holding that non-unanimous jury verdicts do not violate the defendant’s constitutional rights, has been called into question by Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Consequently, the Defendant claims this Court should no longer follow Apodaca. However, the issues in Apprendi did not concern non-unanimous verdicts,
Apprendi involved the reversal of the enhancement of a defendant’s sentence upon the trial judge’s post-verdict, factual finding by a mere preponderance of evidence that the offense committed was a hate crime. Apprendi, 530 U.S. at 491-92, 120 S.Ct. at 2363. The Apprendi Court found criminal punishment for a post-trial finding of guilt of an additional element which had not been submitted to the jury, nor which required proof beyond a reasonable doubt to be unconstitutiqnal. Id. The Court’s mention of required unanimity related to the Court’s finding that all elements of a crime for which the defendant is punished must necessarily be proven to the jury beyond a reasonable doubt. We find Apprendi cannot be construed to mean or predict that Apodaca is, or might soon be, overturned.
Further, in State v. Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, the Louisiana Supreme Court held non-unanimous jury verdicts were not l^unconstitutional. It noted that La.C.Cr.P. art. 782 “withstands constitutional scrutiny,” and because it refused to assume that the United States Supreme Court’s “still valid determination that non-unanimous twelve-person jury verdicts are still constitutional may some *1079 day be overturned.” Id., 08-2215, p. 8, 6 So.3d at 743. Relying on Bertrand, this Court upheld the constitutionality of non-unanimous jury verdicts in State v. Barbour, 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142. The United States Supreme Court denied certiorari in Barbour, thereby declining to address the issue of non-unanimous jury verdicts. Barbour v. Louisiana, 562 U.S. 1217, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
The Defendant’s contention that recent post-Apodaca jurisprudence establishes a right to unanimous jury verdicts in all criminal cases is without merit. In McDonald v. City of Chicago, III, 561 U.S. 742, 130 S.Ct. 3020, 3034-35, 177 L.Ed.2d 894 (2010), the U.S. Supreme Court recognized that most, but not all, of the protections of the Bill of Rights have been extended to the states through the Fourteenth Amendment. Citing Apodaca in support of the proposition, however, the Supreme Court specifically stated that, although the Sixth Amendment requires unanimous jury verdicts in federal criminal trials, it does not require unanimous jury verdicts in state criminal trials. Id., 561 U.S. at 766, 130 S.Ct. at 3035, n. 14. In McDonald, the, Supreme Court reaffirmed the holding of Apodaca, rather than questioned it. See also State v. Frith, 13-1133 (La.App. 4 Cir. 10/22/14), 151 So.3d 946. Therefore, this assignment is without merit.

UNCONSTITUTIONALLY EXCESSIVE SENTENCE

In his final assignment of error, the Defendant complains that his four life sentences are excessive because the sentences were ordered to be served consecutively.
| ¡^Appellate counsel acknowledges former defense counsel’s failure to object on this basis or file a motion to reconsider sentence, and he argues that the failure to do so constituted ineffective assistance of counsel.
As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may^be conducted if warranted. State v. Howard, 98-64, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-86, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. In addition, a defendant may not raise on postconviction review a claim of ineffective assistance with respect to the sentence. See State v. Cotton, 09-2397 (La.10/15/10), 45 So.3d 1030, State ex rel. Melinie v. State, 93-1380 (La.1/12/96), 665 So.2d 1172; La. C.Cr.P. art. 930.3.
For a defendant to be successful in a claim of ineffective assistance of counsel, he must show that counsel’s performance was deficient and that he was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel’s performance is considered ineffective when it can be shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. Id. Likewise, counsel’s deficient performance will have prejudiced the defendant if the errors were so serious as to deprive the defendant of a fair trial. Id. To carry this burden, a defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id., 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. This Court has recognized that a defendant must make both showings to establish Lsthat counsel was so *1080 ineffective as to require reversal. State v. Jenkins, 09-1551, p. 4-5 (La.App. 4 Cir. 6/30/10), 45 So.3d 173, 176. Thus, to prevail on this claim the Defendant must show that there is a reasonable probability that, had defense counsel objected to or filed a motion to reconsider sentence and preserved the sentencing issue raised in his first argument, this Court would have found merit in that argument.
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ... excessive ... punishment.” Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Wilson, 11-0960, p. 5 (La.App. 4 Cir. 9/05/12) 99 So.3d 1067, 1071, writ den., 12-2255 (La.3/8/13), 109 So.3d 358 (quoting State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. Id. A trial judge has broad discretion when imposing a sentence, which a reviewing court may not set aside absent a manifest abuse of discretion. State v. Williams, 13-0271, p. 3 (La.App. 4 Cir. 11/13/13), 129 So.3d 692, 695, writ den. 13-2889 (La.5/23/14), 140 So.3d 725. “A sentence is grossly disproportion ate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.” State v. Fleming, 11-1126, p. 7 (La.App. 4 Cir. 5/30/12), 95 So.3d 1125, 1130.
“The relevant question for a reviewing court is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.” State v. Chaplain, 12-1012, p. 14 (La.App. 4 Cir. 5/29/13), 114 So.3d 1274, 1283, writ den. 14-041-1 (La.10/31/14) 152 So.3d 147 26(quoting Smith, 01-2574, p. 6-7, 839 So.2d at 4. An appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Boudreaux, 11-1345, p. 5 (La.App. 4 Cir. 7/24/12), 98 So.3d 881, 885, writ den., 12-1907 (La.11/9/12), 100 So.3d 841. The goal of La.C.Cr.P. art. 894.1 is an articulation of the factual basis for a sentence, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with La.C.Cr.P. art. 894.1. Id. The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with La.C.Cr.P. art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping] in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Materre, 09-1666, p. 15 (La.App. 4 Cir. 12/8/10), 53 So.3d 615, 625. Likewise, it is within a trial court’s discretion to order sentences to run consecutively rather than concurrently. State v. Robinson, 11-0066, p. 15 (La.App. 4 Cir. 12/7/11), 81 So.3d 90, 98.
Here, the trial court did not enunciate reasons for the sentences imposed, but the trial judge noted that the murders were committed at two separate scenes. Nevertheless, the trial court’s omission of any reasons for judgment is irrelevant under these circumstances. In State v. Jefferson, 04-1960, p. 37 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, 603, this Court *1081 rejected the appellant’s argument that it l27should vacate the mandatory minimum sentence imposed because the trial court failed to give its reasons for sentencing or cite any factors enumerated in La.C.Cr.P. art. 894.1. This Court stated that although article 894.1 sentencing factors must be considered in each case, “ ‘[w]hen the statute provides for a mandatory sentence, it is an exercise in futility for the trial court to enumerate its reasons for sentencing.’” Id. (citing State v. Green, 99-2847, p. 8 (La.App. 4 Cir. 11/29/00), 779 So.2d 835, 840).
Additionally, La.C.Cr.P. art. 883 provides in part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
As this Court noted in Jefferson, 04-1960, p. 39, 922 So.2d at 604:
Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, a trial judge retains the discretion to impose consecutive sentences on the basis of other factors, including the offender’s past criminality and violence in the charged crimes. State v. Thomas, 98-1144, p. 1 (La.10/9/98), 719 So.2d 49; State v. Dempsey, 2002-1867, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040, writ denied, 2003-1917 (La.6/25/04), 876 So.2d 823. “Consecutive sentences for crimes arising out of the same act are not per se excessive if other appropriate factors are 'considered.” Dempsey, 2002-1867 at p. 5, 844 So.2d at 1040. However, “[w]hen consecutive sentences are imposed for crimes arising out of the same act, the trial court must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P. art. 894.1.” Id.
In this case, the trial judge noted at sentencing that the four counts of first degree murder arose from two separate acts, and for that reason imposed | ^consecutive sentences. La.C.Cr.P. art. 883.[8] We find no error in the imposition of consecutive sentences. Further, the Defendant has failed to show that his counsel was ineffective. Nor has he shown that the terms and manner of serving his first degree murder sentences are excessive. This assignment of error is without merit.

DECREE

Accordingly, we find the witness testimony as well as the ballistic and firearm evidence presented at trial supports the jury’s finding of the Defendant’s guilt for the first degree murders of the victims' in this case. Similarly, we find the State presented sufficient testimonial evidence to establish the scientific basis for the firearm evidence admitted at trial, such that the jury could reasonably conclude that the Defendant was the perpetrator of the charged offenses. Additionally, Louisiana’s jurisprudence demonstrates that a non-unanimous jury verdict does not violate the Defendant’s constitutional rights of due process. Nor does our jurispru *1082 dence suggest that the trial court ordering the Defendant to serve his sentences consecutively, where the offenses arose from two separate acts, is unconstitutionally excessive. For these.reasons, we affirm the Defendant Felton Bernard’s convictions and sentences.
AFFIRMED

. At trial, Officer Clark corroborated Officer Gaines’ testimony. Officer Clark acknowledged that Officer Gaines remained with Lio-nell Miskell's body, while she and other officers secured the perimeter.

. Officer Clark corroborated Officer Fields testimony at trial that Leon Miskell identified the Defendant, his nephew, as the shooter. Additionally, Officer Gaines testified that he learned from Officers Clark and Fields that Leon Miskell identified the Defendant as the shooter.

.Ann Bernard testified that she was not related to the Defendant by blood, but she "always look[ed at him as her nephew] because the Defendant and his siblings share the same name.”

. Detective Hamilton indicated at trial that he interviewed one Carl Breaux to determine whether the Defendant was in New Orleans during the time of the crime.

. Officer Leary also tested one 40 caliber class 10 millimeter copper jacketed lead bullet, which was fired from a different gun than the 9 millimeter weapon that fired the other ballistics evidence.

. This Court denied the Defendant’s writ seeking reversal of the ruling. See State v. Bernard, unpub., 09-1380 (La.App. 4 Cir. 11/18/09), writ denied, 09-2756 (La.2/26/10), 28 So.3d 276.

. In response to the Defendant’s pro se re- . quest, this Court sent the record to the Defendant and granted him time to file a pro se brief in the present appeal; however, he failed to do so.

. The Second, Third, and Fifth Circuits have found greater sentences for fewer convictions and lesser degrees of murder not constitutionally excessive. See State v. Warren, 43,671 (La.App. 2 Cir. 12/17/08), 2 So.3d 523; State v. Wood, 08-1511 (La.App. 3 Cir. 6/3/09), 11 So.3d 701; State v. Funes, 11-0120 (La.App. 5 Cir. 12/28/11), 88 So.3d 490 (three consecutive life sentences for convictions for second-degree murder not excessive).