MADELEINE M. LANDRIEU, Judge.
. |TWillie R. Jackson appeals his convictions and sentences for aggravate4 rape and sexual battery. For reasons that follow, we affirm.

STATEMENT OF CASE

The defendant, Willie R. Jackson, was charged by grand jury indictment with aggravated rape, a violation of La. R.S. 14:42, and sexual battery, a violation of La. *65 R.S. 14:43.1.[1] A jury found him guilty as charged on both counts. For the aggravated rape conviction, defendant was sentenced to life imprisonment at hard labor;, without benefit of parole, probation or suspension of sentence. For the sexual battery conviction, defendant was' sentenced to ninety-nine years at hard labor without benefit of parole, probation or susperi&ion of sentence. The trial court ordered the two sentencés to run concurrently.

STATEMENT OF FACTS

The defendant’s conviction for aggravatr ed rape arises from his having coerced an eight-year old child to perform oral sex on him. His conviction for sexual battery arises from his having penetrated the child’s vagina with his finger.
hTestimony and evidence presented at trial established that on January 6, 2013, the defendant was at the child’s home watching TV with the child’s father and another adult male whom we will refer to as L.A.[2] The child and her father lived in a home with the child’s paternal grandmother, with the grandmother occupying the upstairs of the residence and the father and his child occupying the downstairs of the residence. L.A. was a neighbor and friend of the child’s father; the defendant was also a friend of the child’s father.
At some point in the evening as the men were watching football, the defendant gave the child’s father prescription muscle relaxers after he' complained of leg pain. Soon thereafter, L.A. left the residence. Apparently, the father then fell asleep. L.A. testified that he returned fifteen to twenty minutes after leaving and went to the side door to enter. L.A. described the side door to the home as having a missing doorknob into which a sock was placed for privacy. He testified that he typically removed the sock and called, into the home when he wanted to gain entry. On this occasion, L.A. . removed the sock and looked into the hole. He was about to call out the father’s name when he saw the child “playing with” the defendant.[3] He §aw. the defendant,- whom he knew as “Mississippi”, .sitting in a chair and the child kneeling in front of the defendant with her head in his crouch. The defendant was .rubbing the child’s back.[4] After several seconds, L.A. called out to the defendant who then jumped up and zipped his pants. L.A. yelled and tried to get in the door, .but was unsuccessful.
|.qL.A. then ran across the street to the home of a female neighbor, L.J., and told her and her son, in crude terms, that he had just observed the child performing oral sex on the defendant. He, L.J. and L.J.’s son ran to the victim’s residence and banged on the doors to the house in an effort to get in. Eventually, the defendant answered the door and asked what was wrong. L.J. confronted the defendant, asserting that he well knew what was going on. Her son then grabbed the defendant, who kept insisting he did not know what they were talking about. L.J. convinced her son to let the defendant go, and the defendant then ran out of the house. L.A. chased the defendant but returned to the *66 victim’s' home after the defendant ran into another neighbor’s home.
L.J. testified that she has lived across the street from the child’s grandmother for many years and has known the child since she was born. She is quite close to the family and considers the child’s father to be like a brother to her. The child refers to her as an “auntie.” L.J. testified that after the scuffle with the defendant near the doorway, she entered the residence and approached the child who was scared; hysterical and curled up in a fetal position on a loveseat with her left forefinger finger in her mouth.- When L.J. asked the child what had happened,’ the child waited about five minutes before telling L.J. that “he” told her if she said anything he would kill her and her father. After L.J. assured the child that she would not let anyone hurt her or her father, the child described to !L.J. how the -defendant had her put his penis in her mouth while he rubbed her back. The victim also told L.J. that the defendant had put his fingers in her vagina. She told L.J. that the defendant- told her he was going to show her how to be a woman, and also, told her that her father would be sleeping for a long time because the defendant had given him some pills.
.| ¿After talking with the victim, and with the child’s grandmother and father, L.J. called 911 from L.A.’s phone.- Both L.J. and L.A. spoke to the 911 operator. The first assignment of error raised by the defendant- in this- appeal is whether the trial court erred when it admitted - into evidence, over the defendant’s hearsay objection, statements made by L.A. on the recording of this 911 call.
Detective Nigel-Baddoo of the New Orleans Police Department child abuse unit was called on the evening of the offense to investigate the allegations made against the defendant. As soon as he received the call, he instructed the officers on the scene to transport the child to Children’s Hospital. He met the child and her father there and took statements from both of .them.
Det. Baddoo went to the crime scene the next day and interviewed the victim’s male neighbor, L.A. At trial, the detective testified that he observed the alley leading to the door of the house where the.victim lived with her father and grandmother. That door did not have a door knob but had a sock in the hole where the door knob would be. He testified that the chair where the defendant was seated when L.A. said he observed the child performing oral .sex on the defendant' was 'approximately eight paces from the door. Photographs depicting the house, the door, the sock in the door knob hole, and the view one would have of the inside of the house from the open ’ doorway, were admitted into evidence. Det. Baddoo testified that based on the statement L.A. gave to him at the scene and his inspection of the premises, he transported L.A. to NOPD headquarters to take from him a recorded statement. The’ trial court admitted this recorded statement into Evidence. This evidentiary ruling forms the basis of the defendant’s second assignment of error in this appeal.
|fiThe victim, who was eight years old at the time of the offenses and tén years old at the time of trial, testified that .she lives with her father and grandmother. She was shown a photograph of the defendant, and, stated that she.knew him, but identified him by his nickname, Mississippi. When , , asked if. the defendant ■ had .ever done anything to her,' she replied “yes.” The following exchange then occurred between the assistant district attorney and the victim:
Q. What did he do to you? •
A. Put his private part in my mouth.
*67 Q. He put his 'private part in your mouth. Okay. Do you know whát <a private part is? Do you know what a man’s private part is?
A. Yes.
Q. "Is a man’s private part different than a lady’s private-part?
A. Yes.
Q. Okay. Did he do anything else with his hands?"
A, Yes.
Q, What did he do with his hand?
A. Stick it in my private part.
The victim identified her signature on a police statement dated January 8, 2013. She also said she remembered going, to Children’s Hospital and telling a doctor everything that had happened to her. She ■acknowledged talking to a woman with the Child Advocacy Center. During the victim’s testimony, the State played a videotaped recording of her interview at the Child Advocacy Center, which Det. Baddoo had arranged in the days following the incident. The child testified that she remembered being given a pen during the interview and being asked to circle,the private part on a picture of a boy. She testified that the part "she circled was the part of defendant that was in her mouth. The drawing .of the male submitted into evidence showed that she circled the penis. She also circled the area on a picture o.f a girl to indicate where defendant had touched her. The drawing of the female submitted into evidence showed that the victim circled the vagina.
IflThe victim testified that L.A. and L.J. arrived at her house, and the defendant opened the door. L.J. asked her what had happened to her and if the defendant had touched her. She initially told L.J. that the defendant had not touched her. The victim said she said that because she was scared, but then told L.J. what the defendant had done to her. She went upstairs with L.J. and told her grandmother what had happened. The victim identified the defendant in the courtroom as the person who had committed these offenses against her.
The victim’s father testified that on the night in question he was at the house where he lived with his daughter and mother, and was watching a football game with his neighbor, L.A., and the defendant. He identified the defendant in court., The victim’s father said he was having leg pain, so the defendant gave him some muscle relaxers. The victim’s father did not recall whether or not " he fell asleep after taking the muscle relaxers, but admitted that he probably did. He described one of the ddbrs to the house, that has a hole in it. He said he has been plugging the hole with a sock until such time that he is able to repair the door. A person looking through the hole in the door can see through to his bedroom and into the den. After the victim’s father took the muscle relaxers given to him by the defendant, L.A. left the house, and the next thing the victim’s father heard was L.A. banging on the door calling his name.
He asked the defendant to let L.A. in, añd the defendant opened the door. L.A. came in with the female neighbor, L.J. and L.J.’s -son. L.A. was shouting. At that point, the defendant left the house. The victim told L.J. what the defendant had done to her, and then the two of them went upstairs. The victim’s father said someone else called the police. He accompanied his daughter to Children’s Hospital.
|7Pr. Matthew DeSchutter, a pediatric emergency room physician at Children’s Hospital, testified that he treated the-victim at the hospital on the evening of the offense. The victim reported to Dr. DeS-chutter that a male acquaintance of her "father had put his private parts in her *68 mouth, had touched her private parts and had threatened to kill her if she disclosed the incident to anyone. Dr. DeSchutter examined the victim, and the examination was normal other than a cut heel and mild vulva vaginitis, or inflammation of the vagina.[5]
Anne Troy, a nurse practitioner at Children’s Hospital, was accepted by the court as an expert in the area of child abuse pediatrics. She met with the victim tejí days after the offense and testified that the victim, using terms to describe body parts that children. sometimes use, disclosed that prior to the January 6th offenses, the defendant had penetrated her vagina with his penis and had coerced the victim to perform other sexual acts upon him. The victim also related to Ms. Troy that the defendant told her he would kill her and her father if she told anyone what he had done. The victim also described the defendant putting his mouth on her breast. When Ms. Troy was asked.her opinion as to what happened to this victim, Ms. Troy replied, “That this is chronic sexual abuse of this child.”
Nicole Heisser, an investigator with the Public Defender’s Office, was called by the defense and testified that she spoke with the victim’s male neighbor, L.A., on September 30, 2013 as part of the investigation of this case. She said that during her interview with L.A., he told her that he watched the alleged abuse of the victim through the hole in the door for several minutes. In his testimony, L.A. |sdenied watching for several minutes. He said it was only a few seconds before he realized what he was witnessing, and that he then called out to the defendant.
The defendant, Willie Jackson, testified in his. own defense. He admitted ¡to prior convictions for aggravated assault and burglary. At the time of the offenses at issue, he lived on the same street as the victim’s family and L.A. He had accused L.A. in the past of stealing, a bicycle from him, apparently suggesting this as a motive for L.A. to lie.
The defendant testified that on the evening of January 6, 2013, he was at the victim’s father’s house watching a football game with him and had been’there all day. He said L.A. came to the housé after he was already there. The defendant admitted giving the victim’s father some prescription pills because the victim’s father asked him if he had anything for leg pain. The defendant testified that he left to go to the store at some point but returned to the house where the victim and her father lived. He said the victim’s father was not sleeping at any time while he was there. He acknowledged that the child was present for some of the evening.
The defendant stated that as he was leaving to go home, he opened the door and three people were there, L.A., L.J. and another person. He said they asked where the victim’s father was. He pointed to the area where the victim’s father was sitting and then left. The defendant testified that several days later he received a call from Det. Baddoo who informed him of the allegations made against him. The defendant denied any wrongdoing. He was arrested several days later pursuant to a warrant.

ERRORS PATENT

A review of the record reveals no patent errors,

*69
ASSIGNMENT OF ERROR NO. 1

lain his first assignment of error, defert-dant argues that the trial court abused'its discretion in permitting the State to introduce into evidence the recording of the 911 call made from L.A.’s cell phone on the evening of the offense. He alleges that L.A.’s statements to the 911 operator constitute inadmissible hearsay.[6],
Prior to trial, the defendant hid filed á motion in limine to bar the statements L.A. made in the 911 call, arguing their admission was inadmissible hearsay, in violation of Louisiana Code of Evidence articles 802 and 805 and that their admission violated his Sixth Amendment right to confrontation. The trial court denied the motion finding that the statements made in the 911 call were “within a time frame for which medical treatment would be required, as well as police action,_” This ruling appears to have been based on a finding that admitting the recording did not violate the Sixth Amendment’s Confrontation Clause.[7] Defendant has not raised this issue on appeal. Instead, he urges on appeal his state law hearsay objections.
Whether an out-of-court statement is admissible under state hearsay rules is a separate issue from whether such a statement is admissible under the Confrontation Clause. In Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the United States Supreme Court instructed that when a Imstaternent is not procured with “a primary purpose of creating an out-of-court substitute for trial testimony, ... the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.” Id., 562 U.S. at 358-359, 131 S.Ct. at 1155. Thus, after holding that the statements at issue in Bryant were not testimonial and their admission at the defendant-petitioner’s trial did not violate the Confrontation Clause, the Court remanded the case, stating: (‘We leave for the Michigan courts to decide on remand whether the statements’ admission was otherwise permitted by state hearsay rules.” Id., 562 U.S. at 378, 131 S.Ct. at 1167. Accordingly, we examine our state hearsay rules to determine whether the defendant’s assignment of error has merit.
The Louisiana Code of Evidence defines hearsay as a statement (an oral or written assertion or nonverbal conduct if intended as an assertion) other than one made by the declarant while testifying in the present trial or hearing, offered in evidence to prove the truth of the matter, asserted. La. C.E. art. 801(A)(C). Hearsay is not *70 admissible except as provided by law; See La. C.E. art. 802.
Generally, “[a] trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion.” State v. Greenberry, 2014-0335, p. 13 (La.App. 4 Cir. 11/19/14), 154 So.3d 700, 708, writ denied, 2014-2656 (La.10/9/15), 178 So.3d 1000, quoting State v. Cyrus, 2011-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565. However, in the present case, the trial court made no ruling as to whether the complained of statements were admissible as either non-hearsay or fell within one of the hearsay exceptions set out in our Code of Evidence. The trial court’s ruling on the defendant's pre-trial motion most reasonably appears to have resolved the admissibility of this recording in light of |nthe Confrontation Clause only. Thus, this Court must necessarily conduct a de novo review of defendant’s objection on state law hearsay grounds.
After the victim in this case told the female neighbor, -L.J., what the defendant had done to her, L.J. called 911. using L,A.’s cell phone. L.A.. began talking to the operator a few minutes into the recording. The operator asked L.A. the. name of the alleged suspect, and L.A. gave her the nickname of “Mississippi” as well as the name of Willie Jackson. The 911 operator asked whether this person made sexual advances toward the child, whereupon L.A. told her he peered through the hole in the door to call “my partner,” obviously referring to the victim’s father, and “I saw her [with her mouth on his penis].”[8] L.A. apologized for being so blunt, then stated: “He told her if you tell my daddy I’m a kill you and her — I’m a kill your daddy and you. And the baby just said that to us on the porch.” L.A. subsequently stated: “And he gave him some pills to knock him out [sic] and so he can go to sleep so he could do what he ha'd to do, and that ain’t the first time he did it. Cause she told her auntie that he did it before, but nobody ain’t believe her.”
Defendant argues that L.A.’s '911 statements were not admissible under the excited utterance exception to the hearsay rule, La.C.E. art. 803(2). He also argues that L.A.’s 911 statements do not qualify as non-hearsay under La. C.E. art. 801(D)(1)(d) as the initial complaint of sexually assaultive behavior. The State argues that L.A,’s statements were admissible as excited utterances pursuant to La. C.E. art. 803(2). .
li2The record establishes that the victim’s initial complaint of sexually assaul-tive behavior was made to the female neighbor, L.J. There is nothing in the record to support a finding that L.A. Was with the child when the child made the disclosure. Thus, L.A’s 911 statements are not admissible as non-hearsay under La. C.E. art. 801(D)(1)(d). See State v. Hamdalla, 2012-1413, p. 9 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, 624.
We next address ■ whether the statements made by L.A. on the 911 call were admissible under the excited utterance exception to the hearsay rule. An “excited utterance” is defined in the Louisiana Code of Evidence as “a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” La. C.E. art. 803(2)
For the excited utterance exception to the hearsay rule to apply, “the event must be sufficiently startling to render the declarant’s . normal reflective thought process inoperative, and the state *71 ment must be a spontaneous reaction to the event and not the result of reflective thought.” State v. Bernard, 2014-0580, p. 20 (La.App. 4 Cir. 6/3/15), 171 So.3d 1063, 1077, citing State v. Henderson, 362 So.2d 1358, 1362 (La.1978). The most important factor in determining whether a statement was made under the stress of a startling event is the time span between the event and the statement. State v. Dalton, 99-0902, p. 4 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 183. Courts have also considered whether the statement is self-serving or in response to an inquiry; whether the statement expands beyond a description of events to include past or future facts; and whether the declarant performed tasks requiring reflective thought between the event and the statement. State v. Falkins, 2012-1654, p. 17 (La.App. 4 Cir. 7/23/14), 146 So.3d 838, 850; State v. White, 2000-1740, p. 5 (La.App. 4 Cir. 11/21/01), 802 So.2d 869, 873. The trial court must determine whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and the restoration of a reflective thought process. State v. Everett, 2011-0714, p. 17 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 620, citing State v. Lee, 2001-2082, p. 12 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 626.
In the present case, the record reflects the following sequence of events between L.A.’s observation of the sexual abuse of the victim by defendant and the 911 call. L.A. observed defendant committing a crime against the child, watching through the hole in the side door. He banged on that side door, yelling for the victim’s father. He then ran across the street to L.J.’s residence and told her what happened. L.J. described L.A. at that time as-sad, upset and crying,-. ‘L.J,- went inside her home for a moment to retrieve her cellphone and shoes, and then she, her son, and L.A. went across the street to the victim’s father’s residence. L.J. testified she beat on the victim’s father’s front door, demanding that defendant open it, and that he finally did so after ten to fifteen minutes.
Defendant fled the scéne, and‘L.A. said he chased him down'* the block until he went into another male neighbor’s home.[9] At some point, L.A. returned to the victim’s father’s residence. Meanwhile, L.J. had entered the residence when the defendant opened the door, and asked the victim what was wrong. After the victim related to L.J. what the defendant had doné, L.J. took her upstairs and told the victim’s grandmother what h'ad happened. After the victim and L.J. had talked to the victim’s grandmother,-there was some discussion among the adults presentas luto what they should do next. L.J. said she then went outside and called 911 on L.A.’s cell phone.
Although the time period between the event and the statements to the 911 operator was not established with any degree of certainty, it is reasonable to conclude that L.A.’s statements to the 911 operator were not excited utterances as contemplated by La. C.E. art. 803(2).
 However, even assuming the 911 statements did not qualify as excited utterances, and were inadmissible hearsay, it is well-settled that the erroneous admission of hearsay testimony is harmless error where the 'effect is merely cumulative of other testimony adduced "at trial. Bernard, 2014-0580, p. 21, 171 So.3d at 1078, citing State v. Johnson, 389 So.2d 1302, *72 1306 (La.1980). An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172; State v. Barbour, 2009-1258, p. 14 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1150.
In the present case, L.A. testified at trial to what he observed and was subject to cross-examination, L.A.’s testimony was supported by the testimony of L.J. as to L.A.’s emotional state and what he told her upon his arrival to her residence, which he stated occurred almost immediately after observing defendant molesting the victim. L.J. testified that L.A. was sad, upset, and crying; that he just kept shaking his head; and that he finally described to her how the defendant was sexually abusing the young child.
Additionally, L.J. testified that when she asked the child what happened, the child told L.J. that “he,” clearly referring to defendant, told her that if she said anything he was going to kill her and her father. L.J. testified that she assured the |1fichild she would not let anyone hurt her or her father, whereupon the child told her that the defendant put his penis in her mouth and his finger in her vagina. L.J. also testified that the child related to her that the defendant told the child he was going to show her how to be a woman, and that her father was going to be sleeping for a long time because he had given him some pills. <v
As stated above, this testimony by L.J. about what the victim told her was admissible as non-hearsay under La. C.E. art. 801(D)(1)(d), because the' statement was the victim’s initial complaint of sexually assaultive behavior. The content of these statements by the victim to L.J. was virtually identical to the content of L.A.’s three statements to the 911 operator, covering (1) defendant’s sexual assault of the victim, (2) defendant’s threat that he would kill the victim and her father if she told anyone about the sexual assault, and (3) defendant’s admission that he had given the victim’s father pills that would keep him sleeping for a long time.
The victim,. only ten years old at the time of trial, testified that she knew the defendant, and she then described the horrific things he had done to her on the evening of January 6, 2013 when she was only eight years old. Her testimony established that the • defendant committed the offenses of aggravated rape and sexual battery as defined by La. R.S. 14:42 and 14:43.1.[10]
|1fiThus, even assuming that the trial court erred in admitting the 911 statements of L.A. because they constituted inadmissible hearsay, the statements were merely cumulative of other admissible testimony. We conclude that it is beyond a *73 reasonable doubt that, the guilty verdicts rendered in the present case were surely unattributable to. any error in. admitting L.A.’s 911 statements at trial. Thus, any such error was harmless.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, defendant argues that the trial court erred in playing for the jury the videotaped statement that L.A. gave to Det; Baddoo, arguing that it was inadmissible hearsay. In response to defendant’s argument, the State does not argue that' this out-of-court statement was properly admitted or that it was offered for any reason other than to prove the truth of the matter asserted. In fact, the State’s appellate brief .includes the following statement: “While the State does not concede that it was, in fact error, to admit the statement, it is not necessary to argue that its admission was proper because any error was clearly harmless.”
As stated above, the erroneous admission of hearsay testimony is harmless error where the effect is merely cumulative of other testimony adduced at trial. Bernard, 2014-0580, p. 21, 171 So.3d at 1078, citing State v. Johnson, 389 So.2d 1302, 1306 (La.1980). The defense essentially concedes that the videotaped statement was cumulative to L.A.’s trial testimony by arguing that its admission constituted impermissible “bolstering” of L.A.’s trial testimony. The defendant 117further stated in his appeal brief that “[t]he effect of playing it was. to allow [L.A.] to repeat .his story about what he supposedly saw when he looked through the hole in the side door of [the victim’s father’s] house.” The defendant has not pointed to any particular statement in the recording that was not otherwise properly admitted.[11]
Even assuming that the videotaped statement. was inadmissible hearsay, its admission was harmless error as it was merely cumulative of other evidence adduced at trial. .Because the overall evidence against the defendant, including the trial testimony of L.A., L. J, and the victim, was substantial, we conclude that it is beyond a reasonable doubt that the guilty verdicts in the present case were surely unattributable to any error in admitting L.A.’s videotaped statement.
There is no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant’s convictions and sentences.
AFFIRMED.
TOBIAS, J., concurs in the result.

. The crimes in this case occurred in 2013. The crime of aggravated rape was renamed "first degree rape” by the 2015 amendment to La. R.S. 14:42.

. We refer to the witnesses by their initials or by their relationship to the victim to protect the victim’s identity. See La. R.S. 46:1844(W).

. The record reflects that L.A. began crying at this point in his testimony.

. L.A. initially testified that he could see the defendant’s penis at that time, but later in his testimony said he did not actually see the defendant’s penis.

. Det. Baddoo had, pursuant to a search warrant, obtained a buccal swab from the defendant to compare with the sexual assault kit prepared from the victim's examination at Children's Hospital. The DNA sample obtained from the victim tested negative for the defendant's DNA,-

. While defense counsel did not contemporaneously object when the state introduced the 911 recording, the issue is preserved for our appellate review because defendant had filed a written motion prior to trial seeking to preclude the admissibility of the recording. La.C.Cr.P. art 841(B).

. Where the primary purpose of a 911 operator's questions is to enable police assistance to meet an ongoing emergency and not to elicit specific information to give to the police so they can track down and apprehend the’ suspect, the admission into evidence of statements made by 911 callers in response to such questions does not violate the Confrontation Clause. See Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165. L.E.2d 224 (2006)(statements made by domestic violence victim in response to 911 operator’s questions not testimonial and thus not violative of Confrontation Clause); see also State v. Thomas, 2011-1219 (La.App. 4 Cir. 12/6/12), 106 S0.3d 665 (admission of 911 caller’s statements not a violation of Confrontation Clause where purpose of the 911 call was to meet an ongoing emergency involving multiple gunshots near caller’s home, not to give police specific information so they could track down and apprehend the suspect).

. L.A. used crude language to describe the oral sex act.

. . This other male neighbor is only referred to in the record by his last name and nickname. He did not testify at trial.

. Included in the definition of aggravated rape under La. R.S. 14:42(A) is "a rape committed ... where' the anal, oral, or vaginal intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances: ... (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.”
La. R.S. 14:43.1 defines sexual battery, in pertinent part, as
[t]he intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the -offender by the victim using any instrumentality or any part of the body of the victim, when any of the following occur:
(1) The offender acts without the consent of the victim.
(2) The act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender.

. We have been unable to view the actual videotaped statement of L.A. that was admitted into evidence and submitted to this Court because-it is apparently corrupted.