765 So.2d 1103 (2000)
STATE of Louisiana
v.
Ruffin MOYE.
No. 99-KA-2413.
Court of Appeal of Louisiana, Fourth Circuit.
June 14, 2000.
*1104 Harry F. Connick, District Attorney, Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney, Orleans Parish, New Orleans, LA, Counsel for Plaintiff/Appellee.
Karen Godail Arena, Louisiana Appellate Project, River Ridge, LA, Counsel for Defendant/Appellant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES and Judge MIRIAM G. WALTZER).
ARMSTRONG, Judge.

STATEMENT OF THE CASE
The defendant, Ruffin Moye, was charged on December 3, 1997, by bill of information with two counts of attempted second degree murder. He pled not guilty to both counts. On March 10, 1998, the defendant was tried by a twelve-member jury. He was found guilty as charged on Count 1 and guilty of attempted manslaughter on Count 2. On March 20, 1998, the trial court sentenced the defendant to fifty years at hard labor without benefit of parole, probation, or suspension of sentence on Count 1 and to twenty years at hard labor on Count 2 to run concurrently with the sentence on Count 1. The defendant filed a motion for reconsideration of sentence; and, on November 12, 1998, the trial court re-sentenced the defendant to ten years at hard labor on each count to run concurrently. On appeal, the defendant raises one assignment of error.

STATEMENT OF THE FACTS
Detective Calvin Brazley testified that on June 6, 1997, he investigated a shooting at 1679 North Broad Street. He stated that the nine millimeter casings were recovered from the second room, or bedroom, of the house and that there was blood leading out of the house. Detective Arthur Kaufman testified that when he arrived at the scene, he saw a female, Sheryl Jenkins, toward the rear of the house. He said that she was bleeding profusely from the shoulder area; and, he saw in a middle bedroom a man who had been shot twice in the head. Kaufman testified that he asked the man, Paul Adams, who shot him and that Adams told him that the defendant had. Adams also told him that the defendant was a client of his. Kaufman testified that an hour later he went to the hospital and showed a photographic lineup to Adams, who chose the defendant's picture. Officer Robert Stoltz testified that he assisted Kaufman in compiling the photographic lineup and that when they arrived at the hospital, he asked Adams who shot him. He stated that after Adams said that the defendant shot him, he showed Adams the lineup and that Adams chose the defendant's picture. He then located Ms. Jenkins who told him that the defendant shot her, and she also chose the defendant's picture out of the photographic lineup.
*1105 Sheryl Jenkins testified that she had been living with Paul Adams for three months prior to the shooting and that on the evening of the shooting, Adams went out to buy chicken at around 6:15 p.m. She further testified that when he came back, he was very angry and could not tell her why he was so upset, although he tried. She said that he went to the closet, took out a pipe that he wrapped in a black jacket, and ran out the door and across the neutral ground. Ms. Jenkins testified that he came back about five minutes later and that he was angry because someone had cursed at him. He left again to go to his office that was at the corner of North Broad and D'Abadie. Ms. Jenkins said that he stayed there for five minutes and that while Adams was gone, the defendant came into the house. He asked her why Adams was angry, hit him in the chest, and told him to give a message to someone else. Ms. Jenkins testified that she told the defendant that she did not know why Adams was angry. She stated that Adams then returned and was at the front door when he and the defendant had words. She testified that she knew that the defendant was a client of Adams, a lawyer. She stated that the defendant pulled out a gun and that after Adams ordered him to leave, the defendant left through the back door. After the defendant left, Adams told her why he was angry and upset. Ms. Jenkins testified that after five to seven minutes, the defendant reentered the house through the front door that had been left open. She and Adams were in the bedroom, which was behind the living room; and, she saw the defendant before Adams did because Adams had his back to the door. Ms. Jenkins testified that she saw the defendant holding a gun and pointing it toward Adams' head. She said that the defendant shot Adams in the jaw and then turned and shot her four times. She ran out of the back door and saw a neighbor who told her that the police had been called. Ms. Jenkins went back into the house to see if Adams was still alive, and he told her to call the police. She then went out of the front door and collapsed on the porch. She denied that either she or Adams used drugs the day of the shooting although she admitted that they both had used drugs. She testified that Adams was subsequently killed two blocks from his house and that she did not know who killed him.
Officer Raynard Lyons testified that when he arrived at the scene, he found a woman slumped over the front steps of the residence. He saw a massive amount of blood on her clothing and on the ground. He asked her what happened, and she told him that there was someone else inside the house. Lyons said that he went inside and found a second victim who also had a fair amount of blood on his clothing. Lyons said that after other officers arrived, he heard that victim tell one of the detectives that it was the defendant who shot him.
Brenda Lashley testified that she knew the defendant from the neighborhood and that on June 6, 1997, she was with her neighbor on the neighbor's porch when the defendant came by and asked for some water. Ms. Lashley said that the defendant went into the neighbor's house; and when he came back outside, she saw the defendant and Adams. She testified that Adams had something that looked like a gun with something draped over it and that the defendant kept pushing it down. Ms. Lashley said that she screamed because she believed Adams had a gun and that she and the neighbor ran inside. She stated that she then saw the defendant get into a car with one of his friends and saw Adams walking in the direction from which he came.
Madge West testified that she lived at 1606 North Dorgenois and that she had known the defendant for seven years. She further testified that when she heard a commotion outside, she went to her door and saw a man poking the defendant in the side with what looked like a gun that had had a windbreaker thrown over it but which had been taken off while the defendant *1106 was being poked with it. She also stated that she heard this man say to the defendant that he had better tell him and that if he did not, he would shoot the defendant. Ms. West said that afterwards, she saw the man walking toward Broad and that the defendant left to go shopping. She saw the defendant about an hour later when he came by her house to show her grandson what he had bought.

ERRORS PATENT
A review of the record reveals an error patent with regard to the defendant's sentence for attempted second degree murder. This sentence is illegally lenient in that it did not include the condition that it be served without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27 D(1). However, because this is an error favorable to the defendant and the State has not complained, the illegally lenient sentence cannot be corrected on appeal. State v. Fraser, 484 So.2d 122 (La.1986); State v. Samuels, 94-1408 (La.App. 4 Cir. 6/7/95), 657 So.2d 562. There are no other errors patent.

ASSIGNMENT OF ERROR
In his sole assignment of error, the defendant complains that he received ineffective assistance of counsel because his trial counsel failed to object to hearsay testimony that Paul Adams had identified the defendant as the person who shot him.
Generally, the issue of ineffective assistance of counsel is a matter more properly raised in an application for postconviction relief to be filed in the trial court where an evidentiary hearing can be held. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Sparrow, 90-1498 (La. App. 4 Cir. 12/29/92), 612 So.2d 191. Only when the record contains the necessary evidence to evaluate the merits of the claim can it be addressed on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Kelly, 92-2446 (La.App. 4 Cir. 7/8/94), 639 So.2d 888, writ denied, 648 So.2d 921 (La. 1995). The present record is sufficient to evaluate the merits of the defendant's claim.
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that his counsel's performance was deficient and that deficient performance prejudiced him. With regard to counsel's performance, the defendant must show that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. As to prejudice, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, i.e. a trial whose result is reliable. Id., 466 U.S. at 687, 104 S.Ct. at 2064. Both showings must be made before it can be found that the defendant's conviction resulted from a breakdown in the adversarial process that rendered the trial result unreliable. Id. A claim of ineffective assistance may be disposed of on the finding that either of the Strickland criteria has not been met. State v. James, 88-0269 (La.App. 4 Cir. 12/14/89), 555 So.2d 519, writ denied, 559 So.2d 1374 (La.1990). If the claim fails to establish either prong, the reviewing court need not address the other. Murray v. Maggio, 736 F.2d 279 (5 Cir.1984).
The defendant argues that the testimony about Adams' identification of him as the shooter was not admissible under any of the exceptions to the hearsay rule set forth in Articles 803 and 804 of the Louisiana Code of Evidence. The State argues that this testimony was admissible as a dying declaration.
La. C.E. art. 804 B(2) provides that a statement made by an unavailable declarant while believing that his death is imminent concerning the cause or circumstances of what he believes to be his imminent death is not excluded by the hearsay rule. In the present case, Adams had been shot in the jaw; and, there was testimony that he had lost a great deal of blood. However, there was no testimony indicating or implying that *1107 Adams believed that his death was imminent; and, Adams, in fact, did not die from the gunshot wound to his jaw, but was killed sometime afterwards by an unknown assailant. See State v. Winn, 97-2509 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271. Therefore, the hearsay testimony that he identified defendant as the shooter was not admissible as a dying declaration.
Although the hearsay testimony was not admissible as a dying declaration, it was admissible as an excited utterance under La. C.E. art. 803(2). Article 803(2) provides that a statement relating to a startling event or condition or made while the declarant was under the stress of excitement caused by the event or condition is not excluded by the hearsay rule. Adams first identified the defendant as the shooter when Detective Kaufman entered the house and found Adams lying on the floor bleeding from his wound. Adams was still under the stress of excitement caused by his being shot when he identified the defendant as the one who shot him. See State v. Richardson, 97-1995 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, writ denied, 747 So.2d 1119.
Even if the hearsay testimony should have been objected to as inadmissible under any of the exceptions to the hearsay rule, the defendant has not established how he was prejudiced considering the testimony of Sheryl Jenkins identifying him as the man she saw shoot Adams.
This assignment of error is without merit.
For the foregoing reasons, the defendant's convictions and sentences are affirmed.
AFFIRMED.