STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

25-731

STATE OF LOUISIANA

VERSUS

DAMIEN DASHAUN BERNARD
AKA DAMIEN BERNARD

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NUMBER CR 184545
HONORABLE ROYALE L. COLBERT, DISTRICT JUDGE

**********

CLAYTON DAVIS
JUDGE

**********

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.

AFFIRMED WITH INSTRUCTIONS.

**Donald Dale Landry, District Attorney**
**Lance C. Beal, Assistant District Attorney**
**15th Judicial District, Lafayette Parish**
**P. O. Box 3306**
**Lafayette, LA 70502**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Rémy Voisin Starns**
**The Office of the State Public Defender**
**301 Main Street, Ste. 700**
**Baton Rouge, LA 70825**
**(225) 219-9305**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Damien Dashaun Bernard**

**Justin C. Harrell**
**Louisiana Appeals & Writ Services**
**1100 Poydras  Street, Ste. 2900**
**New Orleans, LA 70163**
**(504) 585-7329**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Damien Dashaun Bernard**

**DAVIS, Judge.**

Damien Dashaun Bernard was found guilty of second degree murder by a unanimous jury verdict. He was sentenced to life, without the benefit of parole, probation, or suspension of sentence. He now appeals.

## FACTS

JonTerez Broussard, a twenty-year-old woman, joined her friends, Sophie Flores, Nina Castille, and Jacob Harper, for a night out in downtown Lafayette. JonTerez texted Defendant, Damien Dashaun Bernard, to arrange a purchase of cocaine. She walked ahead of her friends and met Defendant in an alcove, paid ninety dollars for what she believed was a gram of the drug, then rejoined her friends.

They then went to a bar. JonTerez invited Sophie and Nina into the bathroom where they each snorted the substance. JonTerez ingested the most.

They all began experiencing adverse reactions within minutes. JonTerez appeared to know something was terribly wrong, as she called Defendant and asked: "What did you give me?" Nina testified that JonTerez was screaming at Defendant over the phone. Sophie was the first to lose consciousness. Jacob carried her outside to a police barricade. Officers administered naloxone, an opioid reversal medication, which slowly revived her.

Outside of the bar, officers located an unconscious JonTerez and a semi-conscious Nina. EMTs arrived, performed CPR on JonTerez, attempted to stabilize her, and transported her to Oschner Lafayette General Hospital. Despite their efforts, JonTerez's heart had stopped for an extended time, and her brain had been deprived of oxygen. JonTerez ultimately was declared brain dead and removed from life support several days later.

The Acadian Crime Laboratory analyzed the drug they took and determined it was a combination of fentanyl and heroin. Expert forensic toxicologist, Stephanie

Marco, Ph.D., explained to the jury that the level of fentanyl in JonTerez's blood was almost double the minimum fatal concentration known in the scientific literature.

The Lafayette police later arrested Defendant. He provided a voluntary statement in which he admitted selling JonTerez drugs that night but claimed it was only marijuana.

## ERRORS PATENT

Reviewing the record for errors patent pursuant to La.Code Crim.P. art. 920, we find no errors patent. However, the minutes of sentencing require correction.

The sentencing transcript shows that the trial court ordered Defendant's life sentence to be served at hard labor, but the minutes do not indicate this. Under the jurisprudence, "when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Consequently, we order that the trial court amend the court minutes to reflect that Defendant's life sentence is to be served at hard labor. *See State v. Primeaux*, 19-841 (La.App. 3 Cir. 10/21/20), 305 So.3d 1014, *writ denied*, 21-99 (La. 4/20/21), 313 So.3d 1256, *cert. denied*, __ U.S. __, 142 S.Ct. 137 (2021).

## ASSIGNMENTS OF ERROR

Defendant alleges four assignments of error:

1. The evidence was constitutionally insufficient to establish that the controlled substance distributed by the Defendant was the cause of the victim's death;

2. The trial court erred in admitting hearsay testimony under the dying declaration exception to the hearsay rule;

3. The trial court erred in denying Defendant's motion for mistrial where credible evidence established unauthorized contact between the victim's father and sitting jurors and where the court failed to conduct the searching inquiry; and

4. The trial court erred in imposing a mandatory sentence of life imprisonment without benefit of probation or parole because such sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.

## ASSIGNMENT OF ERROR NO. 1

Defendant argues that the evidence was constitutionally insufficient to establish that the controlled substance he sold was the but-for cause of the victim's death. He argues that since the victim was not under constant surveillance before her death, the drugs she ingested might have come from a source other than him. The victim had measurable levels of multiple drugs in her system, and Defendant asserts the possibility that other opiates caused her death. The coroner did not testify; thus, he was never cross-examined on the cause of death.

The analysis for claims challenging the sufficiency of evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)] standard of review. In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371 (citations omitted).

Louisiana Revised Statutes 14:30.1(A)(3) (footnote omitted) defines second degree murder as the killing of a human being when "the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law, or any combination thereof, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance."

3

The death certificate listed JonTerez's immediate cause of death as fentanyl toxicity. Dr. Billy Rossen, who treated JonTerez after the overdose, testified that JonTerez's "clinical situation, her presentation is consistent with fentanyl causing her to stop breathing, and then for her heart to stop subsequently because of her stopped breathing, and that led to her death, yes." Dr. Gary Guidry, JonTerez's attending physician post-overdose, testified that fentanyl would be the direct cause of JonTerez's death under the circumstances presented. The forensic toxicologist testified that the fentanyl concentration found in JonTerez's blood was consistent with a lethal concentration of fentanyl. Any other substances were excluded as the cause of JonTerez's death. Considering the expert testimony, the evidence is sufficient to find that JonTerez's death was directly caused by fentanyl, a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law.

Defendant admitted that he met with JonTerez downtown and sold her a controlled dangerous substance. The evidence contradicted his claim that he only sold her marijuana. Phone records show that he agreed to sell JonTerez a "G" of "blow" for ninety dollars. Multiple officers testified that "blow" means cocaine; "G" indicates grams.

No marijuana was found on JonTerez's person or in her belongings. All the witnesses testified that marijuana was not seen or used on the night of the incident. Agent Todd Reid, a narcotics technical agent with the Lafayette police, testified that video surveillance showed a drug hand-off between Defendant and JonTerez and that the bag containing the powder was much too small to contain ninety dollars' worth of marijuana.

Jacob and Nina stated that, before purchasing the powder, JonTerez told them she was going to buy cocaine from "Puma," Defendant's nickname. Sophie testified

4

that JonTerez told her she had just purchased cocaine. Both girls asked JonTerez if the powder was safe. JonTerez said she got it from a good friend. Aside from the short window when JonTerez made the purchase, the testimony and video surveillance confirmed that the group remained together.

The testimony was that JonTerez acted normally prior to entering the bathroom and snorting the powder with Nina and Sophie. All witnesses were experienced cocaine users. They each quickly knew they had snorted something other than cocaine. JonTerez quit breathing within minutes of snorting the powder, and Nina and Sophie had rapid-onset lower-level medical complications.

Defendant's claim that "the State could not foreclose the possibility that [JonTerez] met up with someone other than [Defendant] from whom she secured or ingested additional, unknown substance[s]," is highly speculative and unlikely under the evidence presented. The jury justifiably disregarded that possibility. The evidence is sufficient to show that Defendant distributed fentanyl to JonTerez, she snorted it, and it killed her.

Defendant cites *State v. Bartie*, 24-897 (La. 2/6/25), 400 So.3d 896, a case with three dissenting justices, in support of his argument that the State did not definitively rule out that some other drug dealer provided the fatal drug to JonTerez. In *Bartie*, the Defendant, the victim, and their group of friends were avid drug abusers. The group spent their days going from hotel to hotel purchasing and abusing various narcotics. No less than eight different narcotics were mentioned in *Bartie*. The issue there was that, due to the nature of their situation, nobody witnessed the ingestion/injection of all the drugs the victim ingested/injected. No witness could point to which drug dealer sold the victim the fatal dose. There was too much drug abuse and too much traveling around to pinpoint the defendant as the one culpable party.

5

This case is distinguishable. There is one event of drug use and one dealer. There was one proven source of the drugs. Consequently, Defendant's first assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 2

In this assignment of error, Defendant argues that the trial court erred in admitting hearsay testimony of the deceased under the dying declaration exception to the hearsay rule. He claims the State failed to establish that the declarant believed her death was imminent or that she had abandoned all hope of recovery. Defendant argues that JonTerez's question, "What did you give me?", was inadmissible hearsay. The dying declaration exception states:

Louisiana Code of Evidence Article 804(B)(2) provides:

> **B. Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> **(2) Statement under belief of impending death.** A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

Context is critical. Here, Nina, Sophie, and JonTerez snorted a powder, which they believed to be cocaine. Each woman immediately felt something was off, and each had adverse, physical reactions.

Nina believed "[JonTerez] was also starting to realize something was very wrong." She saw JonTerez call Defendant and ask the question. Within minutes, JonTerez was unconscious and never recovered.

In *State v. Plauche*, 09-400, pp. 14–24 (La.App. 3 Cir. 1/6/10), 32 So.3d 852, 862–68 (alterations in original), *writ denied*, 10-302 (La. 9/24/10), 45 So.3d 1070, this court addressed the trial court's application of the dying declaration exception to the hearsay rule, as well as the excited utterance exception:

6

In its reasons for granting the State's motion, the trial court noted that a victim need not express an awareness of impending death, nor must a dying declaration be spontaneous . . . . The trial court concluded that the victim was aware of the magnitude, severity, and significance of her injury.

In addition to finding that the victim's statement was admissible as a dying declaration, the trial court ruled that the statement was admissible as an excited utterance exception to the hearsay rule. The trial court referred to the definition of an excited utterance, a statement describing an event or condition made while the declarant was perceiving the event or condition or immediately thereafter, and which is admissible as a present sense impression. The trial court stated that the main factor to be considered regarding an excited utterance is whether enough time has elapsed since the start of the event for the person to reflect and to fabricate a story.

. . . .

In addition to *Crawford [v. Washington,* 541 U.S. 36, 124 S.Ct. 1354 (2004)], Defendant now refers to *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) and *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). In *Davis* . . . the Supreme Court found that the victim was speaking of events as they were happening as opposed to an interrogation that took place several hours after crime. The Supreme Court also observed that the victim was facing an ongoing emergency and that her statements were necessary to enable the police to resolve the emergency at hand.

. . . .

In *Shepard*, 290 U.S. 96, 54 S.Ct. 22, the defendant was convicted of murdering his wife by poisoning her with bichloride of mercury. Under the dying declaration exception, the prosecution sought to introduce evidence of a conversation between the victim and her nurse wherein the victim reported to the nurse that her husband had poisoned her. The Supreme Court ruled that the victim was "not shown to have spoken without hope of recovery and in the shadow of impending death." *Id*. at 99, 54 S.Ct. 22. The victim's conversation with the nurse occurred two days after she became ill and after her thought and speech processes became rational and orderly. At the time of her statement, neither the victim nor her physicians believed that she was critically ill or that her recovery was hopeless. A week later, the victim relapsed and developed an infection in her mouth, congestion in her eyes and hemorrhaging of her bowels. She died twenty-four days after implicating her husband during the conversation with her nurse.

. . . .

The State refers this court to several Louisiana decisions which interpret the hearsay exception of a dying declaration in Article

804(B)(2). In *State v. Martin*, 562 So.2d 468 (La.App. 5 Cir.), *writ denied*, 566 So.2d 987 (La.1990) . . . [t]he court held that a declarant need not express his belief in direct terms that he going [sic] to die. Instead, "[t]he required state of mind may be inferred from the course of events leading up to the making of the declaration and other pertinent considerations." *Id*. at 471.

. . . .

In *State v. Lucas*, 99–1524 (La.App. 1 Cir. 5/12/00), 762 So.2d 717, the defendant was convicted of second degree murder. The trial court allowed into evidence as dying declarations the victim's statements concerning the identity of the defendant as his assailant and the vehicle driven by the defendant. The testimony at trial indicated that the victim arrived at the hospital unresponsive and covered in blood as the result of a gunshot wound through his lower chest. The victim was considered at that time to be in critical condition. Although he had a pulse, he was not breathing well on his own. After he was resuscitated, his condition improved significantly and he was taken to surgery about one and one-half hours later. Prior to surgery, the victim was questioned by officers concerning his knowledge of who had shot him. Speaking through an oxygen mask and struggling as he spoke, the victim identified the defendant as the perpetrator and the color and make of his car. The victim was aware that he was going to surgery. During surgery, the victim's heart stopped beating, but he was resuscitated again.

The court found no error in the trial court's ruling considering the magnitude of the victim's injury and the circumstances surrounding his declarations. The court concluded that the facts established "an inferential basis for finding that the victim was in fact, and believed himself to be, near death." *Id*. at 724 (citations omitted).

. . . .

Also, unlike the victim in *Gremillion*, 542 So.2d 1074, the victim herein lost consciousness soon after she identified her husband as the shooter, and no other statements were made prior to her death thirty-five hours later. The evidence at the hearing and at trial indicated that as a result of her injury, the victim began to hemorrhage severely soon after giving her brief statement, that she was aware that she was critically injured, and that she could have anticipated or felt that she was in danger of dying. According to Dr. Mayeux, the victim was basically dead once she was en route to the hospital.

The facts of instant case are similar to those in *Verrett*, 419 So.2d 455, wherein the court found that the more serious the injury and impairment of the declarant's physical condition, the more probable was the declarant's belief that the end was near. In the instant case, the victim's airway had to be suctioned before she could speak clearly, and even then, her lungs were filling with blood while she awaited transport to the hospital. The victim went into full respiratory arrest and basically

died en route to the hospital, shortly after the shooting and giving her brief statement to Sergeant Bell. From that point on, the victim's life was maintained with the assistance of life support until the time she was removed from life support at Rapides [hospital] following the determination that she was brain dead. Considering the court's ruling in *Verrett* and the facts and circumstances surrounding the victim's statement, the factfinder could reasonably presume that the victim felt that the end was near.

In *State v. Bernard*, 14-580, pp. 20–21 (La.App. 4 Cir. 6/3/15), 171 So.3d 1063, 1077 (alterations in original), *writ denied*, 15-1322 (La. 6/17/16), 192 So.3d 776, *cert. denied*, 580 U.S. 967, 137 S.Ct. 387 (2016), the fourth circuit addressed a similar issue, approving the application of the dying declaration exception, and finding the "excited utterance" exception applied as well:

> Additionally, Leon Miskell's statement was also admissible pursuant to the "excited utterance" exception of the hearsay rule. An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." La. C.E. art. 803(2). For the excited utterance exception to the hearsay rule to apply, the event must be sufficiently startling to render a declarant's normal reflective thought process inoperative, and the statement must be a spontaneous reaction to the event and not the result of reflective thought. *State v. Henderson*, 362 So.2d 1358, 1362 (La.1978); *State v. Hester*, 99–426, p. 14 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 106.

> The most important factor in determining whether a statement was made under the stress of a startling event is time. Courts have also considered whether the statement is self-serving or in response to an inquiry; whether the statement expands beyond a description of events to include past or future facts; and whether the declarant performed tasks requiring reflective thought between the event and the statement. *Id.*, p[p]. 14–15, 746 So.2d at 106. The trial court must determine "whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process." *State v. Dalton*, 99–0902, p. 4 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 183.

> In *State v. Moye*, 99–2413, pp. 6–7 (La.App. 4 Cir. 6/14/00), 765 So.2d 1103, 1107, this Court found the victim's identification of the defendant as the shooter when the police entered the house and found him lying on the floor bleeding from his wound was admissible under the excited utterance exception to the hearsay rule. This Court noted that the victim "was still under the stress of excitement caused by his being shot when he identified the defendant as the one who shot him." *Id.*, 99–2413, p. 7, 765 So.2d at 1107.

*Plauche*, 32 So.3d 852, and the cases it cites, are like this case and support the trial court's decision to admit JonTerez's statement into evidence. The standard of review is whether the trial court abused its discretion in admitting this evidence. *Vaughn v. Progressive Sec. Ins. Co.*, 03-1105 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207. We find the trial court did not abuse its discretion.

## ASSIGNMENT OF ERROR NO. 3

Defendant claims the trial court erred in denying his motion for mistrial based on improper juror communication. "[A] mistrial is a drastic remedy, and except in instances in which the mistrial is mandatory, is warranted only when a trial court error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial." *State v. Harris*, 00-3459, p. 9 (La. 2/26/02), 812 So.2d 612, 617. Also, "[a] trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion." *State v. Ortiz*, 96-1609, p. 10 (La. 10/21/97), 701 So.2d 922, 929, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998). In criminal cases, "any private communication, contact or tampering directly or indirectly with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial." *State v. Charles*, 377 So.2d 344, 345 (La.1979), *amended by*, 397 So.2d 469 (La.1980).

At trial, the following colloquy occurred:

THE COURT:

Okay, what's going on?

MR. HOUGHTON:

Judge . . . it was reported to me by family members that the father of the alleged victim, Bob Broussard, was standing out on the corner waiting for jurors to file out. He followed jurors up into the parking garage and had conversations.

. . . .

10

THE COURT:

We don't know that, and this is the fourth accusation. If this was the first one, I would say yeah. If this was the second one, I'd say hmmm. This is the fourth accusation of --

MR. BEAL:

There's been no substantiated one. There's not been one substantiated one.

THE COURT:

That's not necessarily true. The lady said that the man passed -- with the badge on, and that he spoke to her yesterday. That was one comment.

. . . .

What's the first thing he did this morning? Walk around with his Bible like he's holier than thou. I'm telling y'all right now, if this parking lot attendant comes and tells me that Mr. Broussard was speaking to one of my jurors -- And ma'am, would you recognize the juror he was speaking to?

MS. MALONE:

It was a group, because they were let out the far door. They all walked -- they were all walking down the sidewalk, which is when Mr. Broussard crossed the street, entered the parking garage, and met them. It was at least four of them.

Thereafter, the trial court questioned Mr. Broussard, the victim's father, about

the allegations:

THE COURT:

Come on in, Mr. Broussard, and close the door. Mr. Broussard, there has been accusation that you were outside speaking to my jurors.

MR. BROUSSARD:

That's not true.

THE COURT:

I'm just letting you know now if I find out that it is correct, I will hold you in contempt.

. . . .

11

They will bring you across the street. What you have done is endanger this trial to a mistrial. The accusation is that when the jurors walked out, after my several admonishments, you waited for them to come out. When that group of jurors walked to the parking lot, you walked to the parking tower with them. Mr. Broussard, you are an officer of the court. If anybody should know better, you should know better.

MR. BROUSSARD:

Judge, let me tell you what I did. When the trial was going on, I was on the cell phone with my daughter, my other daughter who cannot be here. I came out. When she was done, I went down the elevator with her godfather and godmother, Jim McGeehy and Penny McGeehy. We walked across the street together, and we talked. They all had to go up some stairs, but I did not know that's where they were going. I followed Penny and we kept talking. We talked about being parked on the first floor -- around to the first floor.

I turned around, and there were two jurors in my back, right there. I turned my head from them. [I]mediately. I walked out and I walked to the street. That was it. I suggest you speak to Jim and Penny. They're the godparents of my child. They will validate everything I just said. If you want to put me under oath to say that, I will be happy to say that under oath.

THE COURT:

Okay, we have the parking lot attendant coming. We will call you back if we need you.

MR. BEAL:

What jurors were they?

MR. BROUSSARD:

I don't know if there were two. There might have been two. I'm not sure. It's the lady on the bottom row. She's African-American. When I turned like this, (indicating), she was right there. We almost bumped each other. I immediately turned my head, and she turned her head. I walked out into the street because it was right at the opening to go up the stairs. I went into the street, and I walked up the stairs, and went to my car. I got a couple of things out [of] my car, and then that was it.

. . . .

I have to add something. I came back, saw a few jurors. I tried to go in, and they could not go in. So I immediately went into the clerk of court's office because I want to avoid them completely. We went to the

12

other side, through the clerk of court's office, and I stood there. A guy gets on the elevator with a belt on. I asked him if he was a juror, because I don't know. He said no, and that he was here to repair. I immediately went to you.

. . . .

I immediately went to her because then we had to walk. We were going into the first elevator, and they were all right there, the jurors. I walked in a circle. I tried to go into the café, and there's a lady sitting in the cafe, a juror. I did this, (indicating,) I saw her. Then I did this, (indicating), and they were right here. I go into the clerk's office and stand there. My daughter comes into the clerk's office, along with her friend. They were walking across, and I walked with them. I come out of the elevator, and there's a long hall we have to go through. All of the jurors are there. I went to tell her –

. . . .

I had my daughter and her friend walk on each side of me, and I kept my head down, like this (indicating).

. . . .

About going up the stairs. I turned around and there was a juror there. We go this way and that way. You cannot go into the café or the other side, and then I have to come through the same area where they are all sitting on the same side and engaging each other.

MS. PHELPS:

And I told him that you just have to keep walking and just, don't look.

MR. BROUSSARD:

I did. I kept my head down. I had two girls sit down on each side of me. And I have to tell you that my daughter is uncomfortable, extremely. She told me this. She said, "Dad, I don't know what to do. They're just staring at me. The other side is just staring at me and mom, everywhere we go, they are looking for us to do something wrong." My daughter said -- I said, "Baby, report that to the people you are sitting with at the table because they should not be intimidating and staring at you and your mother everywhere that you go."

Then, the trial court questioned the parking lot attendant, Ernest Michael Jr.,

regarding the incident:

13

THE COURT:

Mr. Michael, I know you have not been privy to what's going on. Did you see the gentleman who just left?

. . . .

That is Mr. Broussard. He's a family member of a victim in a case that's going on right now. There was an allegation that he was speaking to some of the jurors during the lunch break, that you may have actually witnessed that. The problem is that you don't know who the jurors are.

What I want to ask, Bailiff, can you take Mr. Michael in the jury room? I want him to look around so he can get an idea of who those people are, and then bring him back in here, please?

. . . .

THE COURT:

Come back in. So the gentleman that left earlier, did you see him talk to any of the people who were in that room?

MR. MICHAEL, JR.

No, I did not.

Thereafter, trial court did not make a formal ruling on the motion. Nonetheless, the following occurred:

MS. BOUSTANY:

Mr. Broussard was speaking with Mr. and Mrs. McGeehy. He was not speaking with a juror, and this trial can proceed.

THE COURT:

Right.

Defendant argues that the trial court erred in failing to grant a mistrial after evidence established unauthorized contact between Mr. Broussard and members of the jury. Defendant asserts that the trial court's manner of addressing the issue was improper. According to Defendant, the trial court's "cursory handling of credible allegations of juror contact, conducted without sworn testimony, formal

14

examination, or reasoned ruling, fell far short of the constitutional safeguards required when a defendant's liberty hangs in the balance." Defendant also claims the "chaotic in-chambers exchange, marked by prosecutorial threats and mutual recriminations, denied [Defendant] the searching inquiry that *Remmer* [*v. United States*, 347 U.S. 227, 74 S.Ct. 450 (1954),] demands."

The State argues that a mistrial was not warranted because Defendant failed to show "actual, substantial prejudice[,]" which would prevent a fair trial. The State says Defendant failed to prove any improper communication between Mr. Broussard and the jurors. Mr. Broussard denied the allegations, and a third-party witness, Mr. Micheal, denied seeing Mr. Broussard speak with any of the jurors. Also, the State claims that Defendant failed to present any evidence of prejudice, as no juror reported being approached or influenced by Mr. Broussard. According to the State, the allegations were "unsubstantiated." Therefore, the State maintains that "since (1) no improper communication was proven nor shown to have even occurred; (2) the conduct described does not constitute juror interference under Louisiana Law; and 3) no actual prejudice to Defendant was shown[,]" a mistrial was not warranted.

As noted earlier, the trial court did not make a formal ruling on Defendant's motion for mistrial. However, since the trial progressed, the trial court impliedly denied the motion for mistrial. *State v. Patterson*. 11-892 (La.App. 3 Cir. 2/1/12), 83 So.3d 1209, *writ denied*, 12-526 (La. 6/1/12), 90 So.3d 435.

We find that the trial court did not abuse its discretion in denying Defendant's motion for mistrial. Mr. Broussard was questioned on the record by the trial court with all counsel present. The trial court questioned the garage attendant, who was present when the alleged conduct occurred, and denied seeing Mr. Broussard speak with any members of the jury. There is no evidence showing that any communication

15

occurred or that the contact prejudiced Defendant. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 4

In this assignment of error, Defendant argues the trial court erred in imposing a mandatory sentence of life imprisonment without the benefit of probation, parole, or suspension of sentence. Defendant contends the sentence is grossly disproportionate to his culpability and violates his Eighth Amendment right against cruel and unusual punishment. Defendant claims that a life sentence is reserved for the most egregious offenders and that he does not fit that description. According to Defendant, he "was a twenty-five-year-old working father of four who distributed approximately one gram of narcotics to a willing and experienced user." He claims he was supporting his children by engaging in street-level drug distribution. He admits that his conduct was improper; however, he maintains it does not justify a lifetime in prison.

The State argues that the trial court properly imposed a mandatory life sentence for Defendant's conviction for second degree murder because Defendant failed to demonstrate any exceptional circumstances that would warrant a lesser sentence. According to the State, factors, such as "Defendant's age, employment status, or family situation, while generally mitigating, do not reclassify a death-causing felony as a minor offense" and do not establish "exceptional circumstances." The State further asserts that courts have upheld mandatory life sentences for drug offenses, citing *Richardson v. Louisiana Dep't of Pub. Safety & Corr.*, 627 So.2d 635 (La.1993); *State v. Temple*, 01-655 (La.App. 5 Cir. 12/12/01), 806 So.2d 697, *writ denied*, 02-234 (La. 1/31/03), 836 So.2d 58; and *State v. Shields*, 454 So.2d 405 (La.App. 4 Cir. 1984). Thus, the state maintains that the trial court did not err in imposing a mandatory life sentence.

16

Defense counsel made a general objection after the imposition of the sentence. However, no motion to reconsider sentence was filed.

> The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence imposed. La.Code Crim.P. art. 881.1 (emphasis added) serves as the basis for this restriction and provides, in pertinent part:
>
> > A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
> > (2) The motion shall be oral at the time of sentencing or in writing thereafter *and shall set forth the specific grounds on which the motion is based.*
> >
> > . . . .
> >
> > D. Failure to make or file a motion to reconsider sentence *or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.*
>
> In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence. Therefore, since Defendant's oral motion did not set forth any specific grounds to support his claim of excessive sentences, we are relegated to a bare claim of excessiveness.

*State v. Barling*, 00-1241, pp. 10–11 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041–42, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted). Thus, Defendant is relegated to bare excessiveness review.

In *State v. Monic*, 24-80, pp. 22–23 (La.App. 3 Cir. 9/25/24), 394 So.3d 381, 396–97, *writ denied*, 24-1282 (La. 1/28/25), 399 So.3d 415, this court stated:

> Whether a sentence is constitutionally excessive is determined by considering whether the sentence is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are

viewed in light of the harm done to society, it shocks the sense of justice.

It is within the legislature's prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. Accordingly, the decision to assess mandatory life sentences is also within the prerogative of the legislature.

Downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender and the circumstances of the case. The "rare circumstances" in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder. In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the "tailoring" of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offenses are so great.

Likewise, where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence that it is legally required to impose. It would be an exercise in futility for the trial court to discuss the factors enumerated in that article when the court has no discretion in sentencing the defendant.

*State v. Nabors*, 53,357, [pp. 3–4] (La.App. 2 Cir. 4/22/20), 295 So.3d 974, 976–77, *writ denied*, 20-709 (La. 10/6/20), 302 So.3d 527 [citations omitted].

Given the law applicable to the review of mandatory life sentences for second degree murder, we find that Defendant failed to rebut the presumption of constitutionality by showing clear and convincing evidence that she is exceptional, namely, that she is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. She did not negate the presumptive constitutionality of the legislature's considered decision to impose this sentence for the most serious of offenses. The trial court was not required to justify the imposition of this mandatory sentence although it did affirmatively state on the record that it saw no reason not to impose the life sentence given these facts. That was entirely within its

authority and discretion under these circumstances. Accordingly, Defendant's assignment of error lacks merit.

The legislature included specific language about unlawful controlled substance distribution in its criteria for second degree murder. Consequently, here Defendant was convicted of second degree murder and sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence in accordance with La.R.S. 14:30.1. Although Defendant bases his argument on his age, employment status, and family situation, those factors do not demonstrate that Defendant was exceptional or entitled to a downward departure from the mandatory life sentence.

Additionally, Defendant cannot raise the issue because he failed to state any grounds for his objection to the sentence and did not file a motion to reconsider the sentence. In *State v. Watson*, 15-392 (La.App. 3 Cir. 10/7/15), 175 So.3d 1192, *writ denied*, 15-2046 (La. 11/7/16), 208 So.3d 897. In *State v. Cofer*, 16-871 (La.App. 3 Cir. 4/5/17), 216 So.3d 313, *writ denied*, 17-1150 (La. 5/11/18), 241 So.3d 1014, this court upheld a mandatory life sentence for second degree murder even though the defendant was a mother of three, a college student, and a first felony offender. As noted in *State v. Richards*, 12-1354 (La.App. 3 Cir. 6/5/13), 114 So.3d 639, *writ denied*, 13-1607 (La. 1/27/14), 130 So.3d 958, mandatory sentences are presumed to be constitutional. Thus, the trial court did not err in sentencing Defendant to life imprisonment. Accordingly, this assignment of error lacks merit.

### DISPOSITION

We affirm Defendant's conviction and sentence. Further, we order the trial court to amend the court minutes of sentencing to reflect that Defendant's life sentence is to be served at hard labor.

**AFFIRMED WITH INSTRUCTIONS.**